# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

        Plaintiff,


v.
                        **MEMORANDUM OF LAW & ORDER**
                        Civil File No. 14-3395 (MJD/TNL)

STEVEN R. MARKUSEN,
JAY C. COPE, and ARCHER
ADVISORS LLC,

        Defendants.

John E. Birkenheier and Nicholas J. Eichenseer, U.S. Securities and Exchange Commission, Counsel for Plaintiff.

No appearance by Defendants Steven R. Markusen or Archer Advisors LLC.

## I.    INTRODUCTION

This matter is before the Court on Plaintiff's Application for Entry of

Default Judgment Against Defendants Steven R. Markusen and Archer Advisors

LLC.  [Docket No 21]  The Court heard oral argument on August 21, 2015.  For

the reasons that follow, the Court grants Plaintiff's motion; however, the Court

1

withholds entering the Judgment until Plaintiff's claims against Defendant Jay

Cope are resolved.

Based on the facts in the record, Markusen completely controlled Archer

and, together, they engaged in long-term fraudulent schemes to bilk investors for

bogus "research expenses" and for fees based on artificially inflated earnings

created by marking the close. The facts demonstrate clear scienter by Markusen

and, thus, Archer, and meet the standards for liability under the Securities Act,

Exchange Act, and Advisers Act.

## II.   FINDINGS OF FACT

The Court makes the following findings of fact:

### A.   Factual Background

#### 1.   The Parties and Relevant Entities

Defendant Steven R. Markusen lives in Minneapolis and is the sole owner

and CEO of Defendant Archer Advisors LLC ("Archer"). (Compl. ¶ 20.)

Markusen has 29 years of experience in the investment industry and is not

registered with Defendant the United States Securities and Exchange

Commission ("SEC"). (Id.)

Defendant Jay Cope resides in Shorewood, Minnesota. (Compl. ¶ 21.)

From 2003 through 2013, Cope worked for Archer. (Id. ¶¶ 21, 52.) He worked

on marketing the Funds, investor relations, and placing trades.  (<u>Id.</u> ¶ 54.)

Archer held Cope out as its Chief Operating Officer ("COO") and a managing

member of Archer.  (<u>Id.</u> ¶¶ 56-58.)  Cope held himself out to investors and others

as an employee and agent of Archer.  (<u>Id.</u> ¶¶ 60-62.)  Archer paid Cope a

monthly salary for his work at Archer; from 2011 to 2013, this was typically

$10,000 per month.  (<u>Id.</u> ¶ 63.)  This salary was for finding new investors, dealing

with existing investors, placing trades, and other operational and administrative

tasks related to being COO, but not for conducting research.  (<u>Id.</u> ¶ 65.)  Cope is

not registered with the SEC.  (<u>Id.</u> ¶ 21.)

Archer is a Delaware limited liability company with its principal place of

business in Wayzata, Minnesota.  (Compl. ¶ 22.)  Archer is not registered with

the SEC.  (<u>Id.</u>)  Its only business purpose was to serve as the investment manager

for two private funds, the Archer Equity Fund ("Equity Fund") and the Archer

Focus Fund ("Focus Fund") (collectively, "Funds"), both of which closed in

October 2013.  (<u>Id.</u>)

The Focus Fund was a Delaware limited liability company based in

Wayzata.  (Compl. ¶ 24.)  It was a private fund managed by Archer for the

benefit of Fund investors.  (<u>Id.</u>)  It had more than 20 investors and, at its peak in

2011, had more than $8 million in net assets.  (Id.)   The Focus Fund was governed by a 2008 LLC agreement and a 2008 offering memorandum ("OM"). (Id.)

The Equity Fund was also a Delaware limited liability company based in Wayzata.  (Compl. ¶ 23.)  It was a private fund managed by Archer for the benefit of Fund investors.  (Id.)  It had more than 40 investors and, at its peak in 2007, had approximately $28 million in net assets.  (Id.)  It was never registered with the SEC.  (Id.)  The Equity Fund was governed by a 2002 LLC agreement and two private OMs dated 2003 and 2008.  (Id.)

Together, the Funds had more than 50 individual investors.  (Compl. ¶ 32.)

CyberOptics Corp. is a NASDAQ-listed company with the ticker symbol CYBE.  (Compl ¶ 171.)  CYBE's shares were thinly traded and they comprised more than 75% of the Funds' combined portfolio.  (Id. ¶¶ 175, 184-85.)

###    2.      Formation of Archer

Markusen formed Archer in 2002 and has been its only owner and CEO since 2003.  (Compl. ¶ 25.)  Archer has no board of directors or trustees; Markusen, alone, controls it.  (Id. ¶ 27.)  Markusen used Archer to manage the Equity Fund and the Focus Fund on behalf of the Fund investors.  (Id. ¶ 26.)  In

exchange for their investments, the investors received membership interests in the Fund LLCs.  (Id. ¶ 29.)  Archer was the managing member of each LLC.  (Id.) Through Archer, Markusen made all investment decisions for the Funds and had exclusive and complete control of the Funds' management and operations.  (Id. ¶ 30.)

Markusen invested most of the Funds' assets in publicly traded U.S. stocks.  (Compl. ¶ 31.)  He claimed that his investment strategy was to seek long-term capital appreciation by buying stock in under-followed and out-of-favor companies that he believed would double in share price in 2 or 3 years.  (Id.) Archer claimed to use a "detailed, fundamental investment research approach" to identify investment opportunities.  (Id.)

Markusen and Archer were investment advisers to the Funds and received compensation in the form of fees.  (Compl. ¶ 34.)  They were in the business of advising the Funds about the value of securities or the advisability of investing, in purchasing, or selling particular securities.  (Id.)  The Funds paid Archer a monthly management fee of 0.125% of the monthly balance of each investor's capital account in the Funds and an annual performance fee of 20% of the Funds' investment gains.  (Id. ¶ 35.)  The Funds also reimbursed Archer for out-of-

pocket expenses that Archer incurred in managing the Funds.  (Id. ¶ 36.)

Markusen submitted Archer's claimed expenses on a monthly basis.  (Id.)

Archer's only sources of income were the management fees, performance fees,

and expense reimbursements from the Funds.  (Id. ¶ 37.)

###    3.    Research Expenses

In 2008, the Equity Fund lost more than half of its value, so Archer was not

entitled to a performance fee at the end of the year and its management fees

decreased.  (Compl. ¶¶ 87-90.)  Overall, Archer's 2008 fees were approximately

$140,000 less than its 2007 fees.  (Id. ¶ 91.)  Although Archer claimed no research

expenses in 2007, it billed $140,494 in research expenses to the Fund in 2008.  (Id.)

The Funds' performance improved in 2010, and, in January 2011, Markusen sent

an email to the Funds' administrator stating that he would no longer charge for

Cope's research.  (Id. ¶¶ 106, 108.)  He did stop billing, but then the Funds fell

almost 10% and, in June 2011, Markusen again began to bill for Cope's research.

(Id. ¶ 109.)

From 2008 to 2013, the Funds reimbursed Archer more than $680,000 for

payments that Markusen claimed Archer had made to Cope, Bloomberg Finance

LP, and Tom Duxbury (an Archer insider).  (Compl. ¶ 38.)  The Funds wired the

money to Archer's bank account, which was under Markusen's sole control.  (<u>Id.</u>

¶ 48.)  Markusen asserted that the payments were reimbursable, out-of-pocket

expenses incurred by Archer.  (<u>Id.</u> ¶ 38, 44, 46-47.)  In reality, Archer paid Cope,

Duxbury, and Bloomberg Finance less than $200,000 during that time period.

(<u>Id.</u> ¶ 39.)  The remainder of the money went to Archer and, in turn, to

Markusen.  (<u>Id.</u>)

Markusen knew that most of the claimed expenses were fake.  (<u>Id.</u> ¶ 97.)

Overall, from 2009 to 2013, the Funds reimbursed Archer almost $500,000 for out-

of-pocket "research" expenses that Archer did not actually pay.  (<u>Id.</u> ¶103.)

Markusen personally spent these reimbursements on items such as country club

dues, a Lexus, and tuition for a boarding school.  (<u>Id.</u> ¶ 105.)

Markusen claimed that Archer paid $415,000 of the $680,000 to Cope as

monthly fees for "research" performed by Cope for the Funds.  (Compl. ¶ 41.)

Cope did little research, creating no written analysis, studies, or

recommendations for Archer, and was only paid $100,000.  (<u>Id.</u> ¶¶ 41, 64.)  Thus,

$315,000 was paid to Archer for research expenses by Cope, yet not paid over to

Cope.  (<u>Id.</u> ¶ 41.)

Starting, at the latest, in February 2008, Cope began creating monthly invoices for "research provided for" Archer, in the amount of his salary, billed to Archer and Markusen, and directing that checks should be payable to Cope. (Compl. ¶¶ 66-67.)  These invoices were for Cope's salary as Archer's COO, and he created the invoices to disguise his salary as a permissible Fund expense.  (Id. ¶ 69.)  However, these payments were not permissible because the Funds' governing documents limited Archer's compensation to a monthly management fee, an annual performance fee, and reimbursement for legitimate expenses.  (Id. ¶ 70.)  Cope's Archer salary should have come from the monthly management fee Archer charged to the Funds or from other Archer assets, not from the Funds. (Id. ¶ 72.)

Based on the Funds' governing documents, investors believed that Archer-related compensation paid to Cope should have come from the management fee. (Compl. ¶ 73.)  The "research" fees paid to Cope were the Funds' largest expense after management fees, amounting to approximately 1/3 of the reimbursed expenses Archer received from the Funds from 2008 to 2012.  (Id. ¶ 75.)

Markusen drafted or controlled the content of all written communications sent to Fund investors.  (Compl. ¶ 78.)  In those documents, he did not disclose

that the Funds were reimbursing Archer for payments to Cope.  (Id. ¶ 77.)  In late

2008, Markusen reassured investors that the Funds were designed to prevent

fraud and that the Funds' independent auditor made sure that all fees and

expenses were appropriate.  (Id. ¶ 92.)

     In July 2013, after Markusen learned that the SEC was investigating

Archer, he stopped billing the Funds for Cope's and Duxbury's "research" fees.

(Compl. ¶ 110.)

### 4.    Soft Dollars for Research Fees

     Markusen also charged the Funds a second time for the amounts that he

claimed that Archer had paid to Cope, Duxbury, and Bloomberg Finance.

     From 2009 to 2013, Markusen and Archer diverted $450,000 in Fund assets

– trade commissions, known as "soft dollars" – to Cope.  (Compl. ¶¶ 119, 121.)

Soft dollars are a percentage of client trade commissions that the brokerage firms

credit back to money managers like Archer.  (Id. ¶ 5.)  Because the managers'

clients pay the entire commission, the manager is supposed to use soft dollar

credits to buy outside research services that help the manager make investment

decisions for his clients.  (Id.)

Markusen and Archer characterized these payments as fees for "research" that Cope performed as an independent consultant, but, in fact, the payments were Cope's salary for working at Archer.  (Compl. ¶¶ 42, 121.)  Markusen also used $50,000 in soft dollars to pay Duxbury and Bloomberg Finance.  (Id. ¶¶ 42, 125.)  These soft-dollar payments were separate from the $680,000 in expenses reimbursed by the Funds, but they covered the same fees Markusen claimed as Archer's reimbursable expenses, so the Funds paid twice for the same "research" fees.  (Id. ¶¶ 42, 124, 127.)

Beginning in 2009, Markusen and Archer opened brokerage accounts in the Funds' names that were governed by soft-dollar arrangements.  (Compl. ¶ 128.)  They opened the accounts for the purpose of generating soft dollars.  (Id.)  Markusen and Archer created the soft dollars that they diverted by racking up trade commissions in the Funds' brokerage accounts through placing excessive trades in those accounts for the sole purpose of generating soft dollars to divert to Cope.  (Id. ¶ 122.)  In 2013, they began executing day trades for the sole purpose of pumping up the soft dollars to pay themselves, although day trading was inconsistent with the Funds' stated investment strategy.  (Id. ¶¶ 158-65.)  The Funds were the beneficial owners of the soft dollars, and the soft dollars

were supposed to be used by the soft-dollar broker, at Archer's direction, to pay

third parties who provided Archer research products or services that benefitted

the Funds.  (Id. ¶¶ 134-35.)

The use of soft dollars creates a conflict of interest between an investment

adviser, such as Archer, and its clients, so it must be disclosed to the SEC.

(Compl. ¶ 137.)  Neither Archer, nor Markusen, nor Cope disclosed to investors

that Fund soft dollars were being paid to Cope, a fact investors would have

wanted to know.  (Id. ¶ 138.)   The 2003 Equity Fund OM, provided to the Equity

Fund's first investors, did not mention soft dollars.  (Id. ¶ 139.)  The 2008 OMs

did allow Archer to use soft dollars, but only for "research products or services"

by third parties that benefitted the Funds.  (Id. ¶¶ 140-43.)

Markusen and Archer falsely represented Cope's work for Archer as

"research" to the soft-dollar brokers and did not reveal that Cope was an Archer

officer and employee, all in order to allow him to receive Fund soft dollars.

(Compl. ¶¶ 146-47.)  The brokers would not have paid the soft dollars to Cope if

they had known that he was an Archer officer or employee.  (Id. ¶148.)

Almost every month from late 2009 through the end of 2012, Cope wrote

Markusen a check for $1,000, for a total of $42,000.  (Compl. ¶ 150.)  These

payments were kickbacks from the $450,000 in soft dollars Markusen had

funneled to Cope.  (Id. ¶¶ 151-52.)  The checks purported to cover Cope's share

of the $2,400 in rent Archer paid each month for its office space.  (Id. ¶ 153.)

However, the rent was paid from Archer's checking account, and Cope's checks

were made out to Markusen personally.  (Id. ¶ 154.)  Markusen deposited the

checks in his personal checking account and did not report them on his taxes as

reimbursement for rent.  (Id.)

### 5.      Audit of Research Fees

Archer was responsible for supplying information to the Funds' auditor

and for preparing Fund financial statements for investors.  (Compl. ¶ 79.)  The

Funds' independent auditor's report stated that the financial statements were the

responsibility of the Funds' management.  (Id. ¶ 86.)  Markusen certified in

writing to the auditor, on Archer's behalf, that the financials were accurate and

that all related-party transactions had been disclosed.  (Id. ¶ 85.)  Then,

Markusen sent the audited financials to investors.  (Id. ¶ 84.)

In March 2009, the Funds' auditor questioned Markusen about the

$140,494 in research expenses the Equity Fund had listed in its 2008 expenses,

most of which were reimbursements paid to Archer for "research" by Cope.

(Compl. ¶ 79.)  Markusen led the auditor to believe that the research fees were paid to "outside entities" and did not disclose that the payments were going to an Archer officer and insider.  (Id. ¶ 81.)  The Equity Fund's final audited 2008 financial statements stated that the Fund "utilizes certain outside entities to perform research functions on behalf of the [Fund]."  (Id. ¶ 82.)  This disclosure was in the Funds' audited financials, which were sent to Fund investors each year, for fiscal years 2009, 2010, 2011, and 2012.  (Id. ¶ 84.)

Additionally, Markusen falsely certified to the auditor, on behalf of Archer, that Archer had disclosed all transactions with related parties; that he had made no false statements to the auditor in connection with the audits; and that there was no instance of fraud involving others that could have a material effect on the Funds' financial statements.  (Compl. ¶ 85.)

### 6.    Reporting of CYBE Holdings

CYBE was the Funds' largest holding after 2009.  (Compl. ¶ 175.)  By the end of 2012, CYBE was more than 87% of the Equity Fund's holdings and more than 74% of the Focus Fund's holdings.  (Id.)  After 2009, the Funds held between 400,000 and 1 million CYBE shares.  (Id. ¶ 176.)  The share price of CYBE declined 25% between August 2011 and August 2012.  (Id. ¶ 177.)  As the shares

declined, Markusen and Cope bought more CYBE shares and increased the

Funds' percentage of the net assets that were held in CYBE.  (Id.)

At the end of 2011 and 2012, through the Funds, Archer controlled more

than 10% of the outstanding common stock of CyberOptics.  (Compl. ¶ 178.)  In

2012, Archer became CyberOptics' largest shareholder.  (Id.)

Federal securities law bars owners of 10% or more of an issuer's security

from retaining any short-term trading profits in that security.  (Compl. ¶ 179.)

Markusen knew that if Archer disclosed that it owned more than 10% of CYBE,

CyberOptics would recover any short-term profits that Archer had made while

trading in CYBE.  (Id.)  In 2011 and 2012, Archer disclosed to the SEC a 9% stake

in CYBE when, in fact, its stake was more than 10%.  (Id. ¶¶ 180-82.)

Also, as a 10% owner of CyberOptics in 2011 and 2012, Archer was

required to disclose its ownership stake to the SEC on Forms 3, 4, and 5.  (Compl.

¶ 183.)  Archer did not file any of those forms with the SEC in those years; nor

did it file an amended or accurate Schedule 13G.  (Id.)

### 7.    Marking the Close

During at least 28 months between 2010 and June 2013, on the last trading

day of these months, Markusen and Cope marked the close in CYBE by placing

14

multiple buy orders in the last 10 to 20 minutes before the close of trading, often

less than one minute before the market closed.  (Compl. ¶¶ 188, 190, 192.)

Markusen placed most of the purchase orders, but Cope placed orders on at least

5 of the days.  (Id. ¶ 188.)  The buy orders were usually "limit" orders in which

Archer agreed to buy CYBE at or below a certain price limit.  (Id. ¶ 190.)   On

most of the 28 days, Markusen or Cope increased the limit on their buy orders as

the close drew nearer.  (Id.)  On many of the days, they placed limit orders at or

above prevailing market prices.  (Id. ¶191.)  On more than half of the days, they

bought CYBE at prices that matched or set the stock's intraday high.  (Id.)

On the 28 days, Archer's trading in CYBE usually represented more than

75% of the total market volume for CYBE in the session's last 15 minutes.

(Compl. ¶ 193.)  Markusen and Cope only engaged in last-minute trading in

CYBE on the last trading day of the month.  (Id. ¶ 194.)

The Funds' portfolios were valued as of the close of trading on the month's

last trading day, and that value was used to calculate the monthly returns Archer

reported to Fund investors and to calculate the monthly management fees Archer

charged to the Funds.  (Compl. ¶ 173.)   Markusen and Archer's purpose in

placing these orders was to drive up the closing price of CYBE on the last day of

the month and, thus, to inflate the Funds' monthly returns and extract additional

management fees for Archer.  (Id. ¶ 174.)  On 22 out of the 28 days, CYBE closed

higher than the previous day.  (Id. ¶ 189.)

Markusen knew that CYBE was thinly traded.  (Compl. ¶¶ 184-86.)  He

knew that, given the thin market for CYBE and the Funds' large CYBE holdings,

Archer's trading in CYBE could impact the share price of CYBE.  (Id. ¶ 186.)  He

also knew that, because CYBE was the Funds' largest holding, a small change in

CYBE's month-end closing share price had a significant impact on the Funds'

performance.  (Id. ¶ 201.)  By marking the close, Markusen and Archer caused or

attempted to cause CYBE to close artificially high.  (Id. ¶ 202.)  These artificially

high month-end prices inflated the monthly returns Markusen reported to

investors, concealed the Funds' true performance, and allowed Archer to collect

additional monthly management fees from the Funds.  (Id. ¶ 203.)

From 2010 to 2013, Markusen drafted monthly newsletters and updates to

investors regarding the Funds' performance, and Markusen and Cope sent the

newsletters and updates out.  (Compl. ¶ 199.)  In the newsletters and updates,

Markusen usually listed the percentage by which the Funds were up or down

from the previous month, based on the month-end closing prices of the stocks in

the Funds' portfolio, including CYBE.  (Id. ¶ 200.)  Cope also used the inflated

performance figures to solicit new capital from existing investors; for example, in

late 2010, he sent inflated Fund performance figures to existing investors shortly

after marking the close in CYBE.  (Id. ¶ 204.)

Markusen and Cope marked the close in CYBE at the end of February,

March, April, and June 2013.  (Compl. ¶ 207.)  In July 2013, they learned that the

SEC was investigating them.  (Id. ¶208.)  Neither Markusen nor Cope ever

marked the close in CYBE again.  (Id. ¶ 209.)

### B.    Procedural History

On September 8, 2014, the SEC filed a Complaint against Markusen, Cope,

and Archer in this Court.  The Complaint alleges: Count 1: Violation of Section

206(1) of the Advisers Act, Falsifying Expenses (against Markusen and Archer);

Count 2: Violations of Section 206(2) of the Advisers Act, Falsifying Expenses

(against Markusen and Archer); Count 3: Violations of Section 10(b) of the

Exchange Act and Rule 10b-5 Thereunder, Misappropriation of "Research"

Expenses and Fees (against Markusen, Cope, and Archer); Count 4: Violations of

Section 17(a)(1) of the Securities Act, Misappropriation of "Research" Expenses

and Fees (against Markusen, Cope, and Archer); Count 5: Violations of Section

17(a)(2) and (a)(3) of the Securities Act, Misappropriation of "Research" Expenses

and Fees (against Markusen, Cope, and Archer); Count 6: Violations of Section

206(1) of the Advisers Act, Misappropriation of "Research" Expenses and Fees

(against Markusen and Archer); Count 7: Violations of Section 206(2) of the

Advisers Act, Misappropriation of "Research" Expenses and Fees (against

Markusen and Archer); Count 8: Violations of Section 10(b) of the Exchange Act

and Rule 10b-5 Thereunder, Manipulative Trading – Marking the Close (against

Markusen, Cope, and Archer); Count 9: Violations of Section 17(a)(1) of the

Securities Act, Manipulative Trading – Marking the Close (against Markusen,

Cope, and Archer); Count 10: Violations of Section 17(a)(2) and (a)(3) of the

Securities Act, Manipulative Trading – Marking the Close (against Markusen,

Cope, and Archer); Count 11: Violations of Section 206(1) of the Advisers Act,

Manipulative Trading – Marking the Close (against Markusen and Archer);

Count 12: Violations of Section 206(2) of the Advisers Act, Manipulative Trading

– Marking the Close (against Markusen and Archer); Count 13: Aiding and

Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5

Thereunder (against Markusen and Cope); Count 14: Aiding and Abetting

Violations of Section 206(1) and (2) of the Advisers Act (against Markusen and

Cope); Count 15: Violation of Section 206(4) of the Advisers Act and Rule 206(4)-

18

8 Thereunder (against Markusen and Archer); Count 16: Violation of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder, Reporting Violations (against Archer); and Count 17: Control Person Liability for Exchange Act Violations (against Markusen).

Defendant Cope, through counsel, filed an Answer to the Complaint on November 3, 2014.  [Docket No. 10]  The Summons and Complaint were served on Defendants Archer and Markusen on November 5, 2014.  [Docket No. 12] Since that date, neither Archer nor Markusen has answered or otherwise appeared in this matter.  Markusen is not an infant or incompetent person; nor is he in the military service of the United States.

On January 15, 2015, the Clerk's Office entered default against Archer and Markusen.  [Docket No. 19]  On June 29, 2015, the SEC filed the current motion for default judgment against Archer and Markusen.  [Docket No. 21]  The motion and accompanying documents were served on Markusen and Archer through U.S. Mail on June 29, 2015.  [Docket No. 24]

The SEC now requests a permanent injunction enjoining Defendants from future securities law violations, joint and several disgorgement and prejudgment interest in the total amount of $716,361.09, and an appropriate civil penalty.

## III.    CONCLUSIONS OF LAW

### A.    Standard for Default Judgment

Because Markusen and Archer have failed to answer or otherwise appear in this matter, and the Clerk's Office has entered default, the SEC is entitled to default judgment.  Fed. R. Civ. P. 55.  The Court accepts the factual allegations in the Complaint as true because "[a] default judgment entered by the court binds the party facing the default as having admitted all of the well pleaded allegations in the plaintiff's complaint." Angelo Iafrate Constr., LLC v. Potashnick Constr., Inc., 370 F.3d 715, 722 (8th Cir. 2004) (citations omitted).

> When a default judgment is entered on a claim for an indefinite or uncertain amount of damages, facts alleged in the complaint are taken as true, except facts relating to the amount of damages, which must be proved in a supplemental hearing or proceeding.

Everyday Learning Corp. v. Larson, 242 F.3d 815, 818 (8th Cir. 2001) (citations omitted).  Actual damages must be proven "to a reasonable degree of certainty." Id. at 819.

### B.    The Research Expense Scheme

#### 1.    The Exchange Act and the Securities Act

##### a)    Standard for Liability

Section 10(b) of the Exchange Act provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

* * *

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . **any manipulative or deceptive device** or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (emphasis added).

Rule 10b-5 of the Exchange Act makes it

unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Similarly, Section 17(a) of the Securities Act makes it illegal

21

for any person in the offer or sale of any securities . . . by the use of
any means or instruments of transportation or communication in
interstate commerce or by use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of
a material fact or any omission to state a material fact necessary in
order to make the statements made, in light of the circumstances
under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business
which operates or would operate as a fraud or deceit upon the
purchaser.

15 U.S.C. § 77q(a).

Section 10(b), and Rule 10b-5 thereunder, requires proof of scienter.  Aaron

v. SEC, 446 U.S. 680, 696 (1980).  Section 17(a)(1) of the Securities Act requires

proof of scienter, but Sections 17(a)(2) and 17(a)(3) do not.  Id. at 697.

[T]o establish a violation under either of these anti-fraud provisions,
the SEC must prove a defendant: (1) engaged in prohibited conduct
(i.e., employed a fraudulent scheme, made a material misstatement
or omission, or engaged in a fraudulent business practice); (2) in
connection with the offer, sale, or purchase of a security; (3) by
means of interstate commerce.  Scienter requires proof of intent to
deceive or severe recklessness.

SEC v. Quan, No. CIV. 11-723 (ADM/JSM), 2014 WL 4670923, at *4 (D. Minn.

Sept. 19, 2014) (citations omitted) amended, 2014 WL 6982914 (D. Minn. Dec. 10,

2014).

22

By extracting fake research fees, Markusen and Archer violated the scheme

liability provisions of the Rule 10b-5(a) and (c) and Section 17(a)(1) and (3).

Defendants also made related material misrepresentations to Fund investors in

violation of Rule 10b-5(b) and Section 17(a)(2).

### b)    Control Person Liability

Markusen incurred secondary liability for Archer's violations under

Section 20(a) of the Exchange Act:

> Every person who, directly or indirectly, controls any person liable
> under any provision of this chapter or of any rule or regulation
> thereunder shall also be liable jointly and severally with and to the
> same extent as such controlled person to any person to whom such
> controlled person is liable (including to the Commission in any
> action brought under paragraph (1) or (3) of section 78u(d) of this
> title), unless the controlling person acted in good faith and did not
> directly or indirectly induce the act or acts constituting the violation
> or cause of action.

15 U.S.C. § 78t(a).

Markusen, alone, controlled Archer, made all investment decisions for the

Funds, and had exclusive and complete control of the Funds' management and

operations.  He was Archer's CEO and only owner.  Markusen is liable for

Archer's conduct.

### c)    The Scheme and the Deceptive or Manipulative Acts

23

Markusen engaged in a five-year scheme to defraud the Funds of

illegitimately claimed research expenses.  Markusen committed a deceptive or

manipulative act in furtherance of a scheme to defraud.  Specifically, he

submitted deceptive and fake reimbursement requests to the Funds'

administrator.  He hid Cope's receipt of the "research" payments from the

Funds' auditors and then misrepresented Cope as an independent research

consultant to the Funds' soft-dollar broker.  Markusen also altered Fund

documents to omit reference to Cope's role as an Archer officer and employee

and to obscure Cope's actual duties.  Finally, Markusen day-traded the Funds'

soft-dollar accounts so that he could secretly divert the soft dollars, which were

Fund assets, to improperly pay Cope and other Archer expenses.

### d)      Material Misrepresentations

Section 17(a)(2) and Rule 10b-5(b) bar misleading or untrue statements.

Section 17(a)(2) further requires that money or property be obtained by the

misrepresentation.  The 2008 OMs falsely stated that soft dollars would only be

used to pay for research services by third parties provided to Archer.  The Funds'

audited financials falsely stated that the research fees were paid to "outside

entities."

These misrepresentations were material because reasonable Fund investors would likely have considered regular Fund payments to Cope, an Archer insider, to be an important fact in their investment decisions. The payments to Cope were large in size relative to the Funds' overall assets. Investors would also have likely wanted to know that Markusen billed the Funds for phony out-of-pocket research expenses.

Markusen and Archer are each independently liable for these misstatements under Rule 10b-5(b) because each was a "person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2302 (2011). The Funds' auditor's report stated that the financial statements were the responsibility of the Funds' management. Markusen certified in writing to the auditor, on Archer's behalf, that the financials were accurate and that all related-party transactions had been disclosed. Then, Markusen sent the audited financials to investors. Markusen and Archer had the final say on what was communicated to investors and how it was communicated.

Markusen and Archer are also separately liable for these misstatements under Section 17(a)(2) because each of them used the misstatements to obtain

money or property.  Through Archer, Markusen used the OMs to improperly

obtain Archer management and performance fees from investors in the Funds.

### e)      Material Omissions

Markusen also made material omissions in furtherance of the scheme.  He

failed to tell investors that the Funds were paying Cope's salary and, thus, were

being double charged for it.  He also failed to disclose that he received kickbacks

from the soft-dollar payments to Cope.  He reassured investors that the Funds

were designed to prevent fraud and that the Funds' independent auditor made

sure that all fees and expenses were appropriate.  Finally, because Archer was a

fiduciary to the Funds, it had a duty to disclose this material information.

### f)      In Connection with the Offer, Sale or Purchase or a Security and by Means of Interstate Commerce

Section 10(b) and Rule 10b-5's "in connection with" requirement is met if

"the scheme to defraud and the sale of securities coincide."  SEC v. Zandford, 535

U.S. 813, 822 (2002).  Section 17(a) is met if the conduct takes place "in the offer or

sale" of a security, whether in the course of an initial distribution or in the course

of ordinary market trading.  See United States v. Naftalin, 441 U.S. 768, 777-78

(1979).  Here, the misrepresentation about soft dollars in the OMs involved

Archer's offer and sale of securities to Fund investors.  Also, the scheme involved

commissions generated by ordinary market trading of securities in the Funds'

soft-dollar accounts.  Finally, Markusen and Archer, "directly and indirectly,

have made, and are making, use of the means and instrumentalities of interstate

commerce and of the mails in connection with the acts and transactions

constituting the violations alleged."  (Compl. ¶ 19.)

### g)   Scienter

"The element of scienter requires proof of intent to deceive, manipulate, or

defraud."  SEC v. Shanahan, 646 F.3d 536, 543 (8th Cir. 2011) (citation omitted).

> [A] finding of scienter may be based upon severe recklessness, that
> is: those highly unreasonable omissions or misrepresentations that
> involve not merely simple or even inexcusable negligence, but an
> extreme departure from the standards of ordinary care, and that
> present a danger of misleading buyers or sellers which is either
> known to the defendant or is so obvious that the defendant must
> have been aware of it.  This definition of recklessness is the
> functional equivalent for intent, requiring proof of something more
> egregious than even 'white heart/empty head' good faith.

Id. at 543-44 (citations omitted).

Because Markusen controlled Archer, his scienter is imputed to Archer.

See SEC v. Montana, 464 F. Supp. 2d 772, 784 (S.D. Ind. 2006).  Markusen's intent

to defraud can be inferred from a multi-year pattern of deceptive and

manipulative conduct, including submitting expense reports that he knew were

fake, which enriched him with money from Fund investors.  Markusen initiated

his scheme when Fund performance fell, reducing his fees, and ended his

fraudulent research scheme as soon he learned of the SEC investigation.

### 2.   The Advisers Act

#### a)   Standard for Liability under the Advisers Act

Sections 206(1) and (2) of the Advisers Act provide:

> It shall be unlawful for any investment adviser, by use of the mails
> or any means or instrumentality of interstate commerce, directly or
> indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud any client or
> prospective client; [or]
>
> (2) to engage in any transaction, practice, or course of business
> which operates as a fraud or deceit upon any client or prospective
> client;

15 U.S.C. § 80b–6.  Advisers are fiduciaries who owe their clients "an affirmative

duty of utmost good faith, and full and fair disclosure of all material facts, as

well as an affirmative obligation to employ reasonable care to avoid misleading

[their] clients."  SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194

(1963) (footnotes omitted).  Liability under Section 206(1) requires proof of

scienter, but liability under Section 206(2) does not.  <u>Steadman v. SEC</u>, 603 F.2d

1126, 1134 (5th Cir 1979).

### b)	Whether Defendants Were Advisers

The Advisers Act defines an "investment advisor" as

> any person who, for compensation, engages in the business of
> advising others, either directly or through publications or writings,
> as to the value of securities or as to the advisability of investing in,
> purchasing, or selling securities, or who, for compensation and as
> part of a regular business, issues or promulgates analyses or reports
> concerning securities.

15 U.S.C. § 80b–2(a)(11).  The statute also lists a variety of exceptions, none of

which apply here.

Archer was an adviser because it was paid by the Funds to manage their

investment portfolios.  Markusen, Archer's CEO and owner, controlled Archer.

Thus, both Archer and Markusen qualify as advisers.

### c)	Scheme to Defraud

Markusen used Archer to misappropriate improper research expenses

from the Funds.  He further failed to disclose the conflict of interest created by an

Archer insider, Cope, receiving soft dollars and research fees from the Funds.

### d)	Material Misrepresentations

29

Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8,

17 C.F.R. § 275.206(4)-8, thereunder bar advisers to a "pooled investment

vehicle" from making material misrepresentations or otherwise defrauding "any

investor or prospective investor" in the vehicle.  The Funds are "pooled

investment vehicles" because they have less than 100 investors and do not

publicly offer their securities.  <u>See</u> 15 U.S.C. § 80a-3(c)(1).

Markusen sent OMs, audited financials, and newsletters through the U.S.

mails or other means and instrumentalities of interstate commerce (Compl. ¶

219) that he knew were materially misleading.

### C.   The Manipulative Trading Scheme: Marking the Close

#### 1.   The Exchange Act and the Securities Act

By manipulating the price of CYBE more than 20 times, Markusen and

Archer violated the scheme liability provisions of the Exchange Act, Rule 10b-

5(a) and (c) and of the Securities Act, Sections 17(a)(1) and (3).  Defendants also

made related material misrepresentations to Fund investors in violation of Rule

10b-5(b) and Section 17(a)(2).  Finally, Markusen incurred secondary liability for

Archer's violations under Section 20(a) of the Exchange Act, as set forth with

regard to the research expense scheme.  Markusen and Archer, "directly and

indirectly, have made, and are making, use of the means and instrumentalities of

30

interstate commerce and of the mails in connection with the acts and transactions

constituting the violations alleged." (Compl. ¶ 19.)

### a)      The Marking the Close Scheme and Scienter

Market manipulation constitutes a fraudulent scheme in violation of

Section 10(b) and Rules 10b-5(a) and (c).  See Santa Fe Indus., Inc. v. Green, 430

U.S. 462, 476 (1977) (holding that "manipulation" under Section 10(b), "refers

generally to practices, such as wash sales, matched orders, or rigged prices, that

are intended to mislead investors by artificially affecting market activity").  "[I]f

an investor conducts an open-market transaction with the intent of artificially

affecting the price of the security, and not for any legitimate economic reason, it

can constitute market manipulation."  SEC v. Masri, 523 F. Supp. 2d 361, 372

(S.D.N.Y. 2007).

Here, Markusen marked the close with the intent to artificially inflate the

price of CYBE and, thereby, inflate his fees.  Markusen marked the close in the

Funds' largest holding more than 20 times over 3 years.  He placed multiple

stair-stepped orders in the last minutes, often driving up the closing price.  He

only took these actions on the last trading day of the month.  Markusen knew

that CYBE was the Funds' largest holding and was thinly traded, so he could

impact the share price.  Moreover, CYBE's share price had recently been in decline, hurting the Funds' performance.  Markusen knew that Archer's performance and, thus, Archer's fees were based on the Funds' value at the end of the month, so he knew that higher CYBE prices on those days allowed him to report higher monthly returns to existing and prospective investors and to collect additional management fees.  Because Markusen personally marked the close, he knew that the monthly Fund performance figures that he reported to investors were misleading.

### b)      Material Misrepresentations from Marking the Close

By marking the close, Markusen materially misrepresented the monthly returns in the Archer newsletters he created and set to investors.  The returns often overstated the Funds' actual monthly returns because of the manipulative trading in CYBE.  Monthly returns reported to investors were sometimes more than 20% higher due to the artificially high month-end prices.  (Compl. ¶ 203.) Reasonable investors would have considered these overstatements to be important factors in their investment decisions.

### c)      The Failure to Disclose Scheme

Section 16(a) of the Exchange Act and Rule 16a-3 thereunder require any person who owns more than 10% of a public company's equity securities to file statements (Forms 3, 4, and/or 5) with the SEC.  15 U.S.C. § 78p(a); 17 C.F.R. § 240.16a-3.

In 2012 and 2013, Archer was the beneficial owner of more than 10% of CYBE common stock because it had voting control over those shares.  However, Archer did not file any of the required forms disclosing that interest.  Markusen, who solely controlled Archer and signed Archer's other SEC filings, is liable for those violations as Archer's controlling person.

### 2.    The Advisers Act

Markusen violated the Advisers Act by using Archer to engage in manipulative trading by marking the close.  This trading benefitting Archer, and thus Markusen, at the Funds' expense.

### D.    Remedies

### 1.    Permanent Injunction

Under Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b); Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(2); and Section 209(d) of the Advisers Act, 15 U.S.C. § 80b-9(d); the SEC may seek a permanent injunction to prevent a defendant from violating federal securities laws.  The Court should

grant the permanent injunction if the SEC proves that the defendant "violated

the law <u>and</u> that there [was] a <u>reasonable likelihood</u> of further violation in the

future." <u>SEC v. Comserv Corp.</u>, 908 F.2d 1407, 1412 (8th Cir. 1990) (citations

omitted). When predicting the likelihood of further violations, the Court

considers

> the totality of the circumstances, including: (1) the degree of scienter
> involved; (2) the isolated or recurrent nature of the infraction; (3) the
> defendant's recognition of the wrongful nature of his conduct; (4)
> the likelihood, because of defendant's professional occupation, that
> future violations might occur; (5) and the sincerity of his assurances
> against future violations.

<u>SEC v. M & A W., Inc.</u>, 538 F.3d 1043, 1055 (9th Cir. 2008) (citation omitted). The

Court also considers evidence of past violations, <u>SEC v. Gruenberg</u>, 989 F.2d 977,

978 (8th Cir. 1993), and the egregiousness of the past violation, <u>SEC v. Sargent</u>,

329 F.3d 34, 39 (1st Cir. 2003).

The Court concludes that permanent injunctions against Markusen and

Archer are appropriate because both were experienced participants in the

securities industry who knowingly and deliberately acted illegally for more than

four years. Both repeatedly exploited the trust of their investors to

misappropriate hundreds of thousands of dollars. Neither Markusen nor Archer

have admitted wrongdoing or given assurances that they will not violate

securities laws in the future.  Under these circumstances, a permanent injunction is justified.

### 2.    Disgorgement

#### a)    Disgorgement Amount

[A] district court has broad equity powers to order the disgorgement of ill-gotten gains obtained through the violation of the securities laws.  Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable.  [T]he amount of disgorgement should include all gains flowing from the illegal activities.  Disgorgement need be only a reasonable approximation of profits causally connected to the violation.

The SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment.  Once the SEC establishes a reasonable approximation of defendants' actual profits, . . . the burden shifts to the defendants to demonstrate that the disgorgement figure was not a reasonable approximation.  . . .

SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1096 (9th Cir. 2010) (citations omitted).  "[D]isgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud[.]"  SEC v. Brown, 658 F.3d 858, 860-61 (8th Cir. 2011) (quoting SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1, 17 (D.D.C. 1998)).  "[T]he overwhelming weight of authority hold[s] that

securities law violators may not offset their disgorgement liability with business expenses." <u>Id.</u> at 861 (citation omitted). "[T]he Court has the equitable authority to order disgorgement in an amount equal to Defendants' ill-gotten gains without requiring that the amount disgorged be tied to specific funds or assets within Defendants' possession and control." <u>SEC v. Quan</u>, No. CIV. 11-723 (ADM/JSM), 2014 WL 4670923, at *13 (D. Minn. Sept. 19, 2014), <u>amended</u>, 2014 WL 6982914 (D. Minn. Dec. 10, 2014).

Archer and Markusen made at least $630,830.31 in ill-gotten gains as a result of their fraud. (Aguilar Decl. ¶ 13.) $588,830.31 consists of fraudulent expense reimbursements deposited into Archer's bank account[1], which Markusen controlled, and $42,000 consists of kickbacks Markusen received from Cope. (Aguilar Decl. ¶¶ 11-13.)

The Court may award disgorgement on a joint and several basis when the entity is jointly owned and controlled by a single individual. <u>See, e.g.</u>, <u>SEC v. Capital Solutions Monthly Income Fund, LP</u>, 28 F. Supp. 3d 887, 899 (D. Minn. 2014). Here, Archer is owned and controlled by Markusen.

---

[1] This amount equals the total Archer claimed to have paid in "research" expenses less amounts actually paid to Bloomberg and Duxbury for research. (Aguilar Decl., Ex. 1.)

The SEC has met its burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment.  Because Defendants have not responded, there is no evidence to rebut the SEC's proof that its figure is reasonable and accurate.

### b)      Prejudgment Interest on the Disgorgement Amount

The Court's decisions on whether to grant an award of prejudgment interest and on the rate used are within the Court's discretion.  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1476 (2d Cir. 1996).

> In deciding whether an award of prejudgment interest is warranted, a court should consider (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.  In an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance.

SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1476 (2d Cir. 1996) (citations omitted).

Prejudgment interest at the rate established by the Internal Revenue Service for tax underpayment is awarded on the disgorgement in order to prevent Defendants from being unjustly enriched through the time-value of the money they fraudulently obtained.  See, e.g., Quan, 2014 WL 4670923, at *14. "That rate reflects what it would have cost to borrow the money from the

government and therefore reasonably approximates one of the benefits the

defendant derived from its fraud." First Jersey Sec., Inc., 101 F.3d at 1476.

Thus, the Court awards prejudgment interest at the rate established by the

Internal Revenue Service for tax underpayment.  (Aguilar Decl. ¶¶ 14-15; Aguilar

Decl., Ex. 3.)

### 3.    Civil Penalties

The SEC further request that the Court impose civil monetary penalties

against Markusen and Archer under Section 20(d) of the Securities Act, 15 U.S.C.

§ 77t(d); Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and Section

209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).  If a defendant's violation

involves fraud, deceit, or manipulation that directly or indirectly results in or

creates the risk of substantial losses to others, the three statutes permit a third-

tier penalty in an amount up to the greater of $150,000 per violation or the

defendant's gross pecuniary gain as a result of the violation.  See 15 U.S.C. §§

77t(d)(2)(C), 78u(d)(3)(B)(iii), 80b-9(e)(2)(C); 17 C.F.R. § 201.1004 (inflationary

adjustment increasing statutory penalties to $150,000).  Congress enacted these

civil penalty provisions "to achieve the dual goals of punishment of the

individual violator and deterrence of future violations."  SEC v. Moran, 944 F. Supp. 286, 296 (S.D.N.Y. 1996).

The amount of the penalty is within the Court's discretion.  See, e.g., 15 U.S.C. § 78u(d)(3)(B) (providing that the court shall determine the amount of penalties "in light of the facts and circumstances").  "Factors courts have considered include the egregiousness of the violation, the isolated or repeated nature of the violations, the degree of scienter involved, and the deterrent effect given the defendant's financial worth," SEC v. Converge Global, Inc., No. 04-80841CV, 2006 WL 907567, at *6 (S.D. Fla. Mar. 10, 2006), as well as "whether the defendant has admitted wrongdoing, the losses or risks of losses caused by the conduct, and any cooperation the defendant provided to enforcement authorities," SEC v. Church Extension of the Church of God, Inc., 429 F. Supp. 2d 1045, 1050 (S.D. Ind. 2005).  The Court may also "consider whether the defendant faces other criminal or civil sanctions and his or her financial condition." SEC v. Brown, 643 F. Supp. 2d 1088, 1092 (D. Minn. 2009), aff'd 658 F.3d 858 (8th Cir. 2011) (citations omitted).

Certain factors weigh in favor of a substantial civil penalty.  Archer and Markusen both carried out multiple illegal schemes and acted with intent to

deceive and defraud. Their fraud lasted for several years and caused substantial

losses to investors. They committed multiple violations of securities laws.

Neither has admitted wrongdoing. On the other hand, at oral argument, the SEC

represented that Archer is now defunct. The SEC represented that it did not

have evidence regarding Markusen's ability to pay, but that, at one point, he had

indicated that he did not have the means to pay. Thus, the record before the

Court does not support an inference that either Defendant has the ability to pay a

civil penalty. Balancing the factors before the Court, the Court concludes that a

penalty of $100,000 is appropriate for each Defendant.

### E.   Judgment

The SEC requests that the Court find that, pursuant to Federal Rule of

Civil Procedure 54(b), there is no just reason for delay and immediately enter

partial judgment against Defendants Archer and Markusen even though the case

continues against Defendant Cope.

A default finding against Markusen and Archer would not be binding on

Cope. And it would not necessarily be inconsistent for the SEC to prevail against

Markusen and Archer and not Cope. However, as to certain claims, such as

Count 8, the allegations against Cope, Archer, and Markusen are identical; some

of the damages would likely be joint and several between Cope on the one hand

and Archer and Markusen on the other; and, under the aiding and abetting

counts, Counts 13 and 14, the SEC alleges that Cope's liability is coextensive with

Archer's and Markusen's for certain violations.  The SEC is currently proceeding

against Cope in this lawsuit.

> When there are multiple defendants who may be jointly and
> severally liable for damages alleged by plaintiff, and some but less
> than all of those defendants default, the better practice is for the
> district court to stay its determination of damages against the
> defaulters until plaintiff's claim against the nondefaulters is
> resolved.  This is not because the nondefaulters would be bound by
> the damage determination against the defaulters, but to avoid the
> problems of dealing with inconsistent damage determinations
> against jointly and severally liable defendants.

Pfanenstiel Architects, Inc. v. Chouteau Petroleum Co., 978 F.2d 430, 433 (8th Cir.

1992) (citation omitted).

Therefore, the Court will grant the SEC's motion, but will withhold entry

of this default judgment until the SEC's claims against Cope are resolved.  See,

e.g., Armagost v. United States, No. 4:07CV3240, 2010 WL 829178, at *2 (D. Neb.

Mar. 4, 2010) (granting government's motion for default judgment, but withhold

entry of judgment until conclusion of lawsuit).

## IV.   CONCLUSION

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

Plaintiff's Application for Entry of Default Judgment Against Defendants Steven R. Markusen and Archer Advisors LLC.  [Docket No 21] is **GRANTED**.  At a later date, as ordered by the Court at the conclusion of this case, Judgment will be entered in favor of the SEC as follows:

1.    Defendants Steven R. Markusen and Archer Advisors LLC are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    a.    to employ any device, scheme, or artifice to defraud;

    b.    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

2.    Defendants Steven R. Markusen and Archer Advisors LLC are permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

    a.    to employ any device, scheme, or artifice to defraud;

    b.    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading; or

c.    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

3.    Defendants Steven R. Markusen and Archer Advisors LLC are permanently restrained and enjoined from violating Section 206(1) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-6(1), by, as an investment adviser, using the mails, or any means or instrumentality of interstate commerce, directly or indirectly, to employ any device, scheme, or artifice to defraud any client or prospective client.

4.    Defendants Steven R. Markusen and Archer Advisors LLC are permanently restrained and enjoined from violating Section 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-6(2), by, as an investment adviser, using the mails, or any means or instrumentality of interstate commerce, directly or indirectly, to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

5.    Defendant Archer Advisors LLC is permanently restrained and enjoined from violating Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3 thereunder, 17 C.F.R.§ 240.16a-3 by, as a direct or indirect beneficial owner of more than 10 percent of any class of any equity security, failing to file the statements required by the Commission.

6.    As provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraphs, Paragraphs 1 through 5, also bind the following who receive actual notice of this Default Judgment by personal service or otherwise:  (a) Defendants' officers, agents, servants, employees, and attorneys; and (b) other

persons in active concert or participation with Defendants or with anyone described in (a).

7.    Defendant Steven R. Markusen is liable, jointly and severally with Defendant Archer Advisors LLC, for disgorgement of $630,830.31, representing profits gained and losses avoided as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon calculated at the rate established by the Internal Revenue Service for tax underpayment, and Defendant Steven R. Markusen is liable for a civil penalty in the amount of $100,000.00 pursuant to 15 U.S.C. §§ 77t(d), 78u(d)(3), and 80b-9(d).  Defendant Steven R. Markusen shall satisfy this obligation by paying $730,830.31, plus the appropriate prejudgment interest, to the Securities and Exchange Commission within 14 days after entry of this Default Judgment.

a.    Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Steven R. Markusen as a defendant in this action; and

specifying that payment is made pursuant to this Default Judgment.

b.     Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action.  By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.  The Commission shall send the funds paid pursuant to this Default Judgment to the United States Treasury.

c.     Defendant shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

8.     Defendant Archer Advisors LLC is liable, jointly and severally with Defendant Steven R. Markusen, for disgorgement of $630,830.31, representing profits gained and losses avoided as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon calculated at the rate established by the Internal Revenue Service for tax underpayment, and that Defendant Archer Advisors LLC is liable for a civil penalty in the amount of $100,000.00 pursuant to 15 U.S.C. §§ 77t(d), 78u(d)(3), and 80b-9(d).  Defendant Archer Advisors LLC shall satisfy this obligation by paying $730,830.31, plus the appropriate prejudgment interest, to the Securities and Exchange Commission within 14 days after entry of this Default Judgment.

a.     Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank cashier's check, or

United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Archer Advisors LLC as a defendant in this action; and specifying that payment is made pursuant to this Default Judgment.

b.      Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action.  By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.  The Commission shall send the funds paid pursuant to this Default Judgment to the United States Treasury.

c.      Defendant shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

9.      After Judgment is entered, this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Default Judgment.

Dated:   November 10, 2015                  s/ Michael J. Davis
                                            Michael J. Davis
                                            United States District Court