# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

Plaintiff,

v.

STEVEN R. MARKUSEN,
JAY C. COPE, and ARCHER
ADVISORS LLC,

Defendants.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 14-3395 (MJD/TNL)

John E. Birkenheier and Robin Andrews, U.S. Securities and Exchange
Commission, Counsel for Plaintiff.

Daniel M. Scott, Kelley, Wolter & Scott, P.A., Counsel for Defendant Jay C. Cope.

## I.      INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Summary

Judgment against Defendant Jay C. Cope.  [Docket No 40]  Cope filed no

opposition to the motion.  The Court heard oral argument on March 4, 2016.  For

the reasons that follow, the Court grants Plaintiff's motion.

## II.     BACKGROUND

### 1.      The Parties and Relevant Entities

Defendant Steven R. Markusen was the Managing Member and CEO of

Defendant Archer Advisors LLC ("Archer").  (Ex. 6, at 2309; Ex. 30 at 12.)

Markusen formed Archer in 2002.  (Ex. 30 at 12.)  Archer was the investment

manager for two private funds, the Archer Equity Fund ("Equity Fund") and the

Archer Focus Fund ("Focus Fund") (collectively, "Funds"), both of which closed

in October 2013.  (Ex. 6 at 2311; Ex. 7 at 86; Ex. 30; Ex. 33; Ex. 48 at 19422, 19425.)

Markusen formed Archer in 2002 for the purpose of managing the Funds.  (Ex. 30

at 12.)  Markusen ran Archer from an office space in Wayzata, Minnesota.  (Id.)

Defendant Jay C. Cope worked at Archer from 2003 through 2013.

(Compl. ¶ 21; Cope Ans. ¶ 21.)  His office was next to Markusen's office,

separated by a glass partition.  (Compl. ¶ 53; Cope Ans. ¶ 53.)  In 2013, Cope had

more than 20 years of experience in the investment business.  (Ex. 6 at 2337.)

The Focus Fund was a Delaware limited liability company located in

Wayzata, Minnesota.  (Ex. 48 at 19424, 19434.)  It had more than 20 investors and,

at its peak in 2011, had more than $8 million in net assets.  (Ex. 52; Ex. 54.)  It was

offered to investors through a 2008 offering memorandum ("OM").  (Ex. 48 at

19424.)

The Equity Fund was also a Delaware limited liability company based in Wayzata.  (Ex. 30 at 12.)  It had more than 40 investors and, at its peak in 2007, had approximately $28 million in net assets.  (Ex. 51; Ex. 53.)  The Equity Fund was governed by a 2002 LLC agreement and two private OMs dated 2003 and 2008.  (Ex. 7; Ex. 30.)

### 2.      The Funds' Payments to Archer

The Funds were authorized to pay Archer in only two manners: they paid Archer a monthly management fee of 0.125% of the monthly balance of each investor's capital account in the Funds and an annual performance fee of 20% of the Funds' investment gains.  (Ex. 30 at 8-9, 15; Ex. 48 at 19430-31, 19437-39.)  Archer received the management fee as consideration for administering the Funds' affairs.  (See, e.g., Ex. 30 at 9.)  The Funds' governing documents did not allow Archer officers or employees to draw a salary from the Funds.  (Id.)

Cope personally sent the OMs to actual and prospective investors in the Funds.  (Ex. 37; Ex. 44.)  During Cope's deposition, he took the Fifth Amendment when asked if he knew that the Funds were not supposed to pay any salary he received for his work at Archer.  (Ex. 2, Cope Dep. 26.)

### 3.    Soft Dollar Accounts

In 2009 and in 2012, Cope and Markusen, on Archer's behalf, opened soft-dollar brokerage accounts in the Funds' names.  (Ex. 45; Ex. 11.)  These accounts were with Ticonderoga Securities ("Ticonderoga") and, later, with Dominick & Dominick LLC ("D&D") when D&D absorbed Ticonderoga's soft-dollar business in 2012.  (Aguilar Decl. ¶ 14, Ex. 2; Ex. 24; Ex. 5, Scambia Dep. 11-12; Ex. 3, Ardrey Dep. 29-33.)

Soft dollars are derived from brokerage trade commissions charged to the Funds on each trade placed by Cope or Markusen in the Funds' accounts.   (Ex. 4, Horan Dep. 31-32.)  Thus, a certain percentage of the commission charged by D&D on the trade went into Archer's soft-dollar account and the rest was retained by D&D.  (Id.)

Archer was not permitted to draw on the soft-dollar balance, because to do so would have created a conflict of interest in which a money manager could potentially receive soft dollars generated by his clients' trade commissions.  (Ex. 12; Ex. 3, Ardrey Dep. 41-45.)  D&D could only pay soft dollars, upon Archer's authorization, to third parties who provided "research related services that assist [Archer] in [its] investment-making decision."  (Ex. 3, Ardrey Dep. 42; Ex. 12.)

### 4.    Cope's Role at Archer

The 2003 Equity Fund OM provided that Cope was Archer's "Chief Operating Officer."  (Ex. 7 at 86.)  In 2010, Cope circulated an Archer marketing presentation that stated: "Mr. Cope is a Managing Member and Chief Operating Officer of Archer Advisors."  (Ex. 6 at 2337.)  He was listed as the "Investor Relations" contact for the Equity Fund, and his email was "jcope@archerequity.com."  (Id. at 2339.)  When, during Cope's deposition, he was asked if he was Archer's chief operating officer or managing member, he stated: "I take the Fifth."  (Cope Dep. 19.)

A 2011 Archer due diligence questionnaire, a copy of which Cope likely received (Ex. 6), listed Cope as an Archer employee and "[k]ey member[] of [Archer's] portfolio management team."  (Ex. 34 at 416-17.)  It further noted that Cope, as one of Archer's "key people," was paid a "[b]ase salary plus bonus." (Ex. 34 at 417.)

Cope held himself out to investors as an Archer employee.  He sent emails updating them on the Funds' performance that were signed "Jay Cope, Archer Advisors, LLC" and that referred to Archer as "We."  (See, e.g., Ex. 46.)  He also sent investors Fund newsletters that listed Cope and Markusen as the contacts for Archer and the Funds.  (See, e.g., Ex. 37 at 2760.)  He sent emails to

prospective investors inviting them to invest in "our Fund" and telling them to "give us a call or stop over" at the Archer office in Wayzata.  (See, e.g., Ex. 44.) Cope also received subscription agreements and checks from investors.  (Id.)

Cope's responsibilities at Archer were marketing, client services, and trading.  (Ex. 34 at 410, 417; Ex. 4, Horan Dep. 25-26, 47.)  In 2010, Cope personally circulated a marketing presentation that stated that he was "responsible for the management of operations, investor relations, and marketing of the Archer Equity Fund."  (Ex. 6 at 2337.)  He took potential and current investors out for dinner and went on trips to market the Funds.  (Ex. 10.) When Archer opened a brokerage account in the Equity Fund's name in 2004, it stated the following on the account application: "Jay Cope is the COO of Archer Advisors LLC.  He will be responsible for the management of operations of Archer Equity Fund, LLC.  Along with the operational duties, Jay will handle investor relations and marketing of the fund."  (Ex. 31 at 8.)

### 5.      Payments to Cope

From February 2008 to October 2013, Cope issued monthly invoices for his work at Archer and received regular monthly payments for his work at Archer. (Aguilar Decl., Ex. 2; Compl. ¶ 66; Cope Ans. ¶ 66.)  From 2008 through 2010,

Cope billed and was paid approximately $6,000 per month.  (Ex. 9; Aguilar Decl., Ex. 2.)  From 2011 through July 2013, Cope billed and was paid approximately $10,000 per month.  (Ex. 8; Aguilar Decl., Ex. 2.)  He billed and was paid approximately $5,000 per month in August, September, and October 2013.  (Aguilar Decl., Ex. 2.)  According to Archer's bank records, these monthly payments were Cope's only regular source of Archer-related income, apart from a one-time marketing bonus in February 2011.  (Aguilar Decl. ¶ 13 n.1.)  Cope took the Fifth Amendment when asked if these monthly payments were his only source of income from Archer.  (Cope Dep. 35.)

From 2008 through 2013, Cope's monthly salary payments totaled $549,284.97.  (Aguilar Decl. ¶ 15, Ex. 2.)  $449,784.97 of this amount consisted of "soft dollars" from D&D.  (Aguilar Decl. ¶ 14, Ex. 2.)  The remaining $99,500 of Cope's salary payments came directly from Archer.  (Aguilar Decl. ¶ 13.)  Archer was, in turn, reimbursed by the Funds for these monthly payments to Cope.  (Aguilar Decl. ¶ 13.)  Thus, the Funds ultimately paid 100% of the $549,284.97 in salary payments Cope received from 2008 through 2013.

### 6.     The Funds' Rules for Soft Dollars

The Funds' OMs provided that Archer could spend "soft dollars" on "[r]esearch products or services provided to [Archer]" by others.  (See, e.g., Ex. 48 at 19446; Ex. 5, Scambia Dep. 17-18.)  The OMs listed as examples: "research reports on particular industries and companies, economic surveys and analyses, recommendations as to specific securities . . . and quotation equipment."  (Ex. 48 at 19446.)  Soft dollars generated by the Funds were required to be used to benefit the Funds, such as to provide "assistance to [Archer] in the performance of its investment decision-making responsibilities" for the Funds.  (Id.)  The OMs did not allow Archer to use soft dollars to pay for anything other than research products or services.  (Id.)  They did not allow Archer to use the soft dollars to pay the salaries of Archer officers or employees.  (Id.)

The D&D managing director in charge of Archer's soft-dollar account, James Ardrey, testified that D&D would never knowingly pay soft dollars back to fund managers, like Archer or Archer's employees, because D&D was "very sensitive to the [trade] commissions being for the benefit of the clients – and by 'clients' I mean the investors."  (Ardrey Dep. 44-45, 54.)  Ardrey also testified that it would be inappropriate for Archer to use the Funds' soft dollars to pay Cope for marketing, trading, or other non-research tasks.  (Id. 53-54, 60-61.)

8

### 7.    Research Expenses

Almost every month from 2008 through 2013, Cope created monthly invoices for his work at Archer.  (Ex. 8, Ex. 9.)  Each invoice amount usually matched the amount of the salary payment Cope received each month, usually approximately $6,000 or $10,000.  (Ex. 8; Ex. 9; Aguilar Decl., Ex. 2.)  The invoices listed Archer and Markusen in the "bill to" line and stated that all checks should be payable to Cope.  (See Ex. 9.)  The invoices merely stated that Cope's services consisted of "research provided for" Archer.  (Id.)

The invoices bore the letterhead "Jay Cope Research" or "JCC Research" and listed Archer's Wayzata address.  (Ex. 9.)  Markusen told an employee at D&D that Cope was an independent research consultant.  (Scambia Dep. 22-23.)

Usually, Cope personally submitted his research invoices to D&D by fax or email.  (Scambia Dep. 22-24; Ex. 25.)  Markusen then authorized D&D to pay the invoices from the Funds' soft-dollar balance.  (Scambia Dep. 20, 23; Ex. 24; Ex. 25.)  D&D employees issued checks directly to Cope because they believed, based on Markusen's representations and Cope's invoices, that Cope was an independent research consultant.  (Scambia Dep. 22-27; Ardrey Dep. 53.)

In 2011, D&D paid Cope approximately $95,905 from the Funds' soft-dollar balance – equal to the total monthly research invoices Cope submitted to

D&D in 2011.  (Ex. 10; Ex. 24.)  In October 2012, Cope sent an email to his tax

preparer and stated that $17,000 of the $95,905 paid to him by D&D was for

"rent" and a "marketing trip."  (Ex. 10.)  However, none of the research invoices

Cope sent to D&D in 2011 listed rent or a marketing trip.  (Ex. 36; Ex. 47.)

From 2008 to 2013, none of the research invoices created by Cope listed

marketing, investor relations, or placing trades as work he performed for Archer.

(Compl. ¶ 68; Cope Ans. ¶ 68.)  During the investigation by Plaintiff United

States Securities and Exchange Commission ("SEC"), the SEC issued a document

subpoena to Cope for "All Documents Concerning any research or other work

you performed for Archer, including but not limited to (i) any research reports or

recommendations you prepared and (ii) any records of time you spent

performing research for Archer."  (Ex. 26, Subpoena at 4.)  Although Cope

produced more than 7,000 documents to the SEC, none included any research

reports or analysis authored by Cope.  (Birkenheier Decl. ¶ 55.)  During Cope's

deposition, he took the Fifth when asked whether he, in fact, performed any

research for Archer.  (Cope. Dep. 33.)

### 8.      Kickback of Soft Dollars to Markusen

Between 2010 and 2013, Cope made monthly payments of $1,000 to

Markusen.  ([Docket No. 23] Aguilar Default Decl. ¶ 12; Aguilar Default Decl.,

Ex. 2; Compl. ¶ 153; Cope Ans. ¶ 153.)  Cope wrote checks from his personal

account to Markusen, personally.  (Ex. 55.)  In the memo line, Cope sometimes

wrote: "Rent."  (Ex. 55; Compl. ¶ 153; Cope Ans. ¶ 153.)  He admitted to his tax

preparer that he was "reimbursed" for these monthly "rent" payments through

the soft dollars he received from D&D for his purported research.  (Ex. 10.)  In

2011, Cope paid $12,000 to Markusen for "rent."  (Id.)

### 9.      Marking the Close

#### a)      Beginning to Mark the Close

Cope knew that the trades he and Markusen placed at D&D generated soft

dollars that he could use to pay his research invoices and that, the more trades he

placed, the more soft dollars were available.  In January 2012, he wrote to a D&D

employee: "Spoke with Jim [Ardrey] regarding our soft dollars, we had a balance

of $7,500 and we did 99,900 shares today at .05/share so we should have enough

to cover my bill.  Please overnight tomorrow."  (Ex. 13.)  Cope often asked D&D

employees about the amount of the soft-dollar balance.  (See, e.g., Ex. 11; Ex. 15;

Ex. 16.)

11

In 2011, Ardrey told Cope that Archer's soft-dollar balance was in "arrears" by approximately $14,000 and that although he knew "thin[g]s have been slow," "if we can make some headway on the balance this month it would help." (Ex. 14.) Cope wrote back that "we will make headway to be sure." (Id.) D&D expected Archer to generate enough trade commissions to cover its soft-dollar expenditures. (Ardrey Dep. 61.)

On April 5, 2013, Ardrey told Cope and Markusen that things had been "extremely quiet" and that the soft-dollar balance was in arrears by more than $40,000. (Ex. 17.) By "extremely quiet," Ardrey meant that "[t]rading levels were low." (Ardrey Dep. 61.) That same day, Markusen wrote back that "we will work on getting [the soft dollar balance] paid back up." (Ex. 17.) Later that day, Cope and Markusen began to day-trade securities in the Funds' brokerage accounts by buying and then selling the same shares on the same trading day. (Aguilar Decl. ¶ 7; Aguilar Decl., Ex. 1; Ardrey Dep. 71-75.) Cope, logging in as JCondor77, placed many of these day trades through his AOL Instant Message account. (Ex. 18; Ex. 4, Horan Dep. 44-45.)

Before April 5, 2013, Cope and Markusen had rarely day-traded securities for the Funds. (Ardrey Dep. 73-74; Aguilar Decl. ¶ 7.) After April 5, 2013,

Archer placed hundreds of day trades in the Funds' accounts.  (Aguilar Decl. ¶ 7;

Aguilar Decl., Ex. 1.)  On July 22, 2013, Markusen wrote Ardrey: "We're working

on bringing this [the soft-dollar balance] down as you have seen since April."

(Ardrey Dep. 76.)

Cope and Markusen continued day trading through July 2013.  Their day

trading increased the trade commissions paid by the Funds by 600%.  (Aguilar

Decl. ¶ 8.)

Cope and Markusen did not disclose their day trading in their

communications to investors.  The OMs stated that Archer sought to acquire long

or short positions in stocks that have characteristics such as low valuations,

strong or improving growth prospects, and stable management.  (Ex. 30 at 6.)

"Long positions are analyzed for growth potential and value.  . . .  The Managing

Member seeks to short stocks that have characteristics such as high valuations,

negative business fundamentals, insider selling, management turnover,

aggressive accounting and weak financial positions."  (<u>Id.</u> at 13.)  The OMs did

not state that day trading was part of Archer's investment strategy.

After factoring in commissions, Cope and Markusen's day trading from April 2013 to October 2013 cost the Funds more than $60,000 in realized trading losses.  (Aguilar Decl. ¶ 9.)

### b)     Marking the Close During Liquidation

On August 24, 2013, Markusen told Cope that he would be closing the Funds at the end of October 2013 because of their poor performance.  (Ex. 33.) However, Cope and Markusen continued to day trade the Funds' soft-dollar accounts until October 25, 2013, days before the Funds closed.  (Ex. 49; Ex. 50; Aguilar Decl., Ex. 1.)  They generated enough trade commissions to eliminate the deficit in the soft-dollar balance, which Archer would have had to pay when it closed the soft-dollar accounts.  (Aguilar Decl. ¶ 7; Scambia Dep. 40.)  Up until liquidation, Cope continued to receive research payments from D&D soft dollars, including $5,000 payments in both September and October 2013.  (Aguilar Decl. ¶ 7.)

### 10.     Audited Financials

From 2008 through 2012, Archer distributed audited annual financial statements of the Funds to investors, and Cope was copied on the emails

14

containing those audited financials.  (See, e.g., Ex. 32.)  Those audited financials

contained a disclosure that stated:

> The [Fund] pays all costs and expenses related to its operations,
> including brokerage commissions and other costs related to
> investment transactions, as well as legal, accounting, auditing, and
> tax return preparation fees.  Additionally, the [Fund] utilizes certain
> outside entities to perform research functions on behalf of the
> [Fund], which are disclosed separately in the statement of operations
> and changes in net assets.

(See, e.g., Ex. 28 at 695.)

No document sent to investors disclosed that Cope was receiving the

Funds' soft dollars or that he was being paid for "research."

### 11.   CYBE

Cope was authorized to place trades in the Funds' brokerage accounts.

(Compl. ¶ 62; Cope Ans. ¶ 62.)  Through those accounts, Cope and Markusen

often bought and sold stock in Minnesota-based CyberOptics, Inc., which was

traded on the NASDAQ exchange under the ticker symbol CYBE.  (Paige Decl.,

Ex. 1, Paige Report ¶¶ 24-27; Horan Dep. 40.)  CYBE was the largest holding in

the Funds' portfolios after 2009.  (See, e.g., Paige Report ¶ 29.)  By the end of

2012, CYBE comprised 87% of the net assets of the Equity Fund and 41% of the

net assets of the Focus Fund.  (Paige Report Table 2.)  By at least November 2010,

Cope and Markusen knew that the Funds held more than 9% of the total CYBE shares outstanding.  (Ex. 21.)  Cope closely monitored the market for CYBE.  (Ex. 19; Ex. 23.)

The average daily trading volume for CYBE was very low for a publicly traded stock.  (Paige Report ¶ 24.)  It was "[t]hinly traded."  (Horan Dep. 40.) Because the Funds owned a significant share of CYBE and it was thinly traded, its price was susceptible to manipulation by Markusen and Cope.  (Paige Report ¶ 27.)  In November 2010, the prime brokerage firm that Archer used for the Funds' assets told Cope and Markusen that CYBE was "illiquid" and that the firm was increasing Archer's margin on the Funds' CYBE position from 40% to 100%.  (Ex. 21.)

Each month, Markusen or Cope sent investors a summary of the Funds' performance from the previous month.  (See, e.g., Ex. 20.)  The monthly performance numbers were based on the value of the stocks in the Funds' portfolios as of the close of the last trading day of the month.  (See Ex. 54.  See also Ex. 19, Monday, July 1, 2013, email from Cope to the Funds' third-party administrator ("CYBE had a funky closing price that will adversely impact monthly results.  Double check closing price with Steve [Markusen].").)

Cope knew that the Funds performed poorly after 2010.  In September 2012, he emailed a Fund investor and stated: "We are very disappointed that our recent performance has not lived up to our historical performance."  (Ex. 40.)  In February 2013, an investor emailed Cope: "It's hard to imagine how you could lose 60% in 2 years."  (Ex. 22.)  In August 2013, Markusen emailed Cope stating that Markusen was going to close the Funds due to "poor performance results over the last two years."  (Ex. 33.)

Cope and Markusen bought CYBE in the closing minutes of trade on at least 28 month-end trading days between January 2010 and June 2013.  (Paige Report ¶ 9; Paige Report, App'x 3.)  Cope placed at least 5 of those orders.  (Paige Report ¶ 60; Paige Report, App'x 3.)  On each of those 28 days, Cope or Markusen placed a sequence of buy orders in the last 30 minutes of trading. (Paige Report, App'x 3.)  The orders were usually limit orders in which Archer agreed to execute the trade at a specified price or better; in a purchase order, the order would only be executed at or below a chosen price limit.  (Paige Report ¶ 42; Paige Report, Table 6.)  As the close of the trading drew closer, Cope and Markusen increased the number and size of their buy orders, particularly above the best bid.  (Paige Report ¶¶ 43-44, 51-52.)  They placed at least one order in the

last minute of trading on 20 of those 28 days.  (Id., App'x 3.)  On many of those

28 days, they placed limit orders at or above prevailing market prices.  (Paige

Report, App'x 3.)  The majority of those days, they bought CYBE within the last

30 minutes of trading at prices that matched or set the intraday high.  (Id.)

On those 28 month-end trading days, Archer's trading in CYBE often

represented more than 40% of the total market volume for CYBE across 12

months.  (Paige Report. ¶ 34; Paige Report, Table 3b.)  Their month-end trading

behavior of placing buy orders with increasing size and aggressiveness in pricing

in the last 30 minutes was different from their trading patterns in CYBE on other

trading days.  (Paige Report ¶ 8.)

The SEC's expert, financial economist Kathryn Paige, opined that Cope's

and Markusen's month-end trading in CYBE was consistent with a systematic

attempt to manipulate the closing price of CYBE, known as "marking the close."

(Paige Report ¶¶ 9-10.)  During Cope's deposition, when he was asked why he

purchased CYBE at the close of the trading day, he took the Fifth Amendment.

(Cope Dep. 70.)

Paige opines that, by marking the close in CYBE on the 28 month-end

days, Cope and Markusen caused or attempted to cause CYBE to close at

artificially high prices on those days.  (Paige Report ¶¶ 61-62.)  In turn, those artificially high month-end prices inflated the monthly returns that Cope and Markusen reported to investors.  (Id. ¶ 30.)

Cope used the inflated earnings, created by marking the close, to solicit new capital for the Funds.  On August 31, 2010, Cope placed 16 buy orders in CYBE in the closing minutes of trading.  (Paige Report, App'x 3.)  His trading drove up the close price, which inflated the Funds' August 2010 performance figures.  (Id.)  In September 2010, Cope sent the August 2010 inflated Fund performance figures to several existing investors.  (Ex. 20; Ex. 37.)  He encouraged one of the Focus Fund investors to invest in the Equity Fund, attaching the Equity Fund's OM along with the August 2010 performance figures.  (Ex. 37.)  Markusen paid Cope a one-time marketing fee based on the value of that investor's holding at the end of 2010.  (Ex. 41.)

### B.    Procedural History

On September 8, 2014, the SEC filed a Complaint against Markusen, Cope, and Archer in this Court.  The Complaint alleges: Count 1: Violation of Section 206(1) of the Advisers Act, Falsifying Expenses (against Markusen and Archer); Count 2: Violations of Section 206(2) of the Advisers Act, Falsifying Expenses (against Markusen and Archer); Count 3: Violations of Section 10(b) of the

Exchange Act and Rule 10b-5 Thereunder, Misappropriation of "Research"

Expenses and Fees (against Markusen, Cope, and Archer); Count 4: Violations of

Section 17(a)(1) of the Securities Act, Misappropriation of "Research" Expenses

and Fees (against Markusen, Cope, and Archer); Count 5: Violations of Section

17(a)(2) and (a)(3) of the Securities Act, Misappropriation of "Research" Expenses

and Fees (against Markusen, Cope, and Archer); Count 6: Violations of Section

206(1) of the Advisers Act, Misappropriation of "Research" Expenses and Fees

(against Markusen and Archer); Count 7: Violations of Section 206(2) of the

Advisers Act, Misappropriation of "Research" Expenses and Fees (against

Markusen and Archer); Count 8: Violations of Section 10(b) of the Exchange Act

and Rule 10b-5 Thereunder, Manipulative Trading – Marking the Close (against

Markusen, Cope, and Archer); Count 9: Violations of Section 17(a)(1) of the

Securities Act, Manipulative Trading – Marking the Close (against Markusen,

Cope, and Archer); Count 10: Violations of Section 17(a)(2) and (a)(3) of the

Securities Act, Manipulative Trading – Marking the Close (against Markusen,

Cope, and Archer); Count 11: Violations of Section 206(1) of the Advisers Act,

Manipulative Trading – Marking the Close (against Markusen and Archer);

Count 12: Violations of Section 206(2) of the Advisers Act, Manipulative Trading

– Marking the Close (against Markusen and Archer); Count 13: Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder (against Markusen and Cope); Count 14: Aiding and Abetting Violations of Section 206(1) and (2) of the Advisers Act (against Markusen and Cope); Count 15: Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder (against Markusen and Archer); Count 16: Violation of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder, Reporting Violations (against Archer); and Count 17: Control Person Liability for Exchange Act Violations (against Markusen).

Defendant Cope filed an Answer to the Complaint on November 3, 2014. [Docket No. 10]

On November 10, 2015, this Court granted the SEC's motion for default judgment against Markusen and Archer.  [Docket No. 39]  However, because the case against Cope was still pending, the Court held that judgment would be entered in favor of the SEC and against Markusen and Archer once the claims against Cope were resolved.

On November 24, 2015, the SEC moved for summary judgment against

Cope.  Cope has filed no opposition to the pending motion for summary

judgment against him.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### B.   Fifth Amendment in Civil Proceedings

"[T]he Fifth Amendment does not forbid adverse inferences against parties

to civil actions when they refuse to testify in response to probative evidence

offered against them[.]"  Baxter v. Palmigiano, 425 U.S. 308, 318 (1976).  "Silence

is a relevant factor to be considered in light of the proffered evidence, but the

direct inference of guilt from silence is forbidden."  <u>LaSalle Bank Lake View v.</u>

<u>Seguban</u>, 54 F.3d 387, 390 (7th Cir. 1995).

>C.      **The Soft-Dollar Research Expense Scheme**

>>1.      **The Exchange Act and the Securities Act: Standard for
>>Liability**

Section 10(b) of the Exchange Act provides:

>It shall be unlawful for any person, directly or indirectly, by the use
>of any means or instrumentality of interstate commerce or of the
>mails, or of any facility of any national securities exchange—

>* * *

>(b) To use or employ, in connection with the purchase or sale of any
>security registered on a national securities exchange . . . **any
>manipulative or deceptive device** or contrivance in contravention of
>such rules and regulations as the Commission may prescribe as
>necessary or appropriate in the public interest or for the protection
>of investors.

15 U.S.C. § 78j (emphasis added).

Rule 10b-5 of the Exchange Act makes it

>unlawful for any person, directly or indirectly, by the use of any
>means or instrumentality of interstate commerce, or of the mails or
>of any facility of any national securities exchange,

>(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Similarly, Section 17(a) of the Securities Act makes it illegal

for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

Section 10(b), and Rule 10b-5 thereunder, requires proof of scienter.  Aaron

v. SEC, 446 U.S. 680, 696 (1980).  Section 17(a)(1) of the Securities Act requires

proof of scienter, but Sections 17(a)(2) and 17(a)(3) do not.  Id. at 697.

> [T]o establish a violation under either of these anti-fraud provisions, the SEC must prove a defendant: (1) engaged in prohibited conduct (i.e., employed a fraudulent scheme, made a material misstatement or omission, or engaged in a fraudulent business practice); (2) in connection with the offer, sale, or purchase of a security; (3) by means of interstate commerce. Further, scienter is required to prove a violation of Section 10(b), Rule 10b–5, and Section 17(a)(1), while Sections 17(a)(2) and (3) are proven by showing a defendant acted at least negligently. Scienter requires proof of intent to deceive or severe recklessness.

SEC v. Quan, No. CIV. 11-723 (ADM/JSM), 2014 WL 4670923, at *4 (D. Minn. Sept. 19, 2014) (citations omitted) amended, 2014 WL 6982914 (D. Minn. Dec. 10, 2014).

Cope engaged in a scheme to misappropriate approximately $500,000 in fake research fees.

### 2. The Scheme and the Deceptive or Manipulative Acts

Cope and Markusen engaged in a scheme to defraud the Funds of illegitimately claimed research expenses. They misrepresented Cope as an independent research consultant so that Cope could be paid with investor money rather than by Archer. Almost every month from 2008 through 2012, Cope created false invoices claiming that he did research for Archer as an independent consultant. With Markusen's approval, Cope sent most of these invoices to D&D, which issued monthly checks to Cope from the Funds' soft-dollar balance.

Cope then kicked back $1,000 of these soft-dollar payments to Markusen.  When the soft-dollar balance fell too low to pay Cope's fake research invoices, Cope personally churned the stocks in the Funds' accounts for the sole purpose of generating soft dollars.  The excessive trading led to a 600% increase in trade commissions charged to the Funds, causing further losses for Fund investors.  The excessive trading was inconsistent with the Funds' stated investment strategy.

Cope failed to disclose to investors that he was receiving research fees or soft dollars from the Funds, even though he personally solicited investors, updated them on the Funds' performance, and sent them Fund materials such as newsletters, emails, and offering documents.

A defendant incurs scheme liability under Rule 10b-5 by committing a deceptive or manipulative act in furtherance of a scheme to defraud.  See In re Global Crossing, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004).  Cope created dozens of deceptive invoices listing his work for Archer as research.  He made $1,000 kickback payments to Markusen disguised as rent checks.  Cope placed many day trades in the Funds' soft dollar accounts for the sole purpose of creating soft dollars that could be funneled back to Cope.  He also deceived D&D and the

Funds' administrator so that he could receive his illegal payments. Thus, Cope

participated in a scheme to defraud under Rule 10b-5(a) and (c) and Section

17(a)(1) and (3).

### 3.   Material Misrepresentations or Omissions

Section 17(a)(2) and Rule 10b-5(b) bar material misleading or untrue

statements. Section 17(a)(2) further requires that money or property be obtained

by the misrepresentation.

"[T]o fulfill the materiality requirement there must be a substantial

likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information

made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (citation

omitted). Here, Cope made material omissions in furtherance of the scheme. He

failed to tell investors that the Funds were paying Cope's salary under the guise

of research fees. A reasonable investor would have considered that information

an important fact in her investment decision, particularly because the illegitimate

payments to Cope for non-existent research were over $500,000. Cope used these

material omissions to obtain investments and to obtain illegitimate research

payments.

27

### 4. In Connection with the Offer, Sale or Purchase or a Security and by Means of Interstate Commerce

Section 10(b) and Rule 10b-5's "in connection with" requirement is met if "the scheme to defraud and the sale of securities coincide." SEC v. Zandford, 535 U.S. 813, 822 (2002). Section 17(a) is met if the conduct takes place "in the offer or sale" of a security, "whether in the course of an initial distribution or in the course of ordinary market trading." See United States v. Naftalin, 441 U.S. 768, 777-78 (1979).

Here, the misrepresentation about payment of research fees to Cope and use of soft dollars in the OMs involved Archer's offer and sale of securities – the LLC interests in the Fund, which the OMs refer to as "securities," to Fund investors. (See, e.g., Ex. 48 at 19462.) Also, the scheme involved commissions generated by ordinary market trading of securities in the Funds' soft-dollar accounts. Thus, the in-connection requirement has been met.

Cope solicited investors through email, and "it is beyond debate that the Internet and email are facilities or means of interstate commerce." United States v. Barlow, 568 F.3d 215, 220 (5th Cir. 2009). Additionally, Cope sent emails, faxes, and instant messages to D&D in order to inquire into the soft-dollar account, to submit his research invoices, to mark the close, and to trade CYBE.

D&D was located in New York, New York (see, e.g., Ex. 11), while Cope was

located in Minnesota.  Therefore, the means-of-interstate-commerce requirement

has been met.

### 5.     Scienter

"The element of scienter requires proof of intent to deceive, manipulate, or

defraud."  SEC v. Shanahan, 646 F.3d 536, 543 (8th Cir. 2011) (citation omitted).

> [A] finding of scienter may be based upon severe recklessness, that
> is: those highly unreasonable omissions or misrepresentations that
> involve not merely simple or even inexcusable negligence, but an
> extreme departure from the standards of ordinary care, and that
> present a danger of misleading buyers or sellers which is either
> known to the defendant or is so obvious that the defendant must
> have been aware of it.  This definition of recklessness is the
> functional equivalent for intent, requiring proof of something more
> egregious than even 'white heart/empty head' good faith.

Id. at 543-44 (citations omitted).

Cope's intent to defraud can be inferred from his words and actions.  He

submitted dozens of invoices falsely characterizing his work as research even

though, as he admitted to his tax preparer, the invoices included non-research

items like a marketing trip.  These invoices caused Cope to be paid hundreds of

thousands of dollars of the Funds' investors' money.  Cope told D&D that the

trade commissions Archer racked up in the Funds' accounts should have been

enough to "cover my bill."  Thus, he knew that the money came from the Funds'

investors.  Cope's and Markusen's scheme coincided with worsening Fund

performance, so legitimate Archer income available to Cope and Markusen –

management and performance fees – were reduced.

Cope's high volume day trading also serves as evidence of scienter.  Before

April 5, 2013, there is no indication that Cope and Markusen day traded stocks in

the Funds' portfolios.  The day D&D warned Cope and Markusen that the soft

dollar balance was too far below zero is the day Cope began day trading.

Moreover, day trading was inconsistent with the Funds' stated investment

strategy and lost money for the Funds.  Cope continued day trading and

collecting soft dollar research payments while the Funds were being wound

down in the fall of 2013.  Liquidating the Funds did not require research or day

trading.  Thus, Cope's day trading was merely a way to take money from the

investors one last time before the Funds were closed, even as the investors were

left with significant realized losses.

Additionally, Cope was an experienced investment professional who

communicated about the Funds to potential and existing investors countless

times over the five-year period.  He took them out to meals, sent the OMs and

newsletters, and served as their contact at Archer.  Moreover, Markusen copied

Cope on emails to investors with audited financials.  Yet Cope never disclosed

that he was receiving hundreds of thousands of dollars from the Funds for

alleged research, even though he was a principal of Archer.

Finally, "the evidence of [Cope's] scienter is reinforced by the adverse

inference from his invocation of the Fifth Amendment privilege at his

deposition."  SEC v. Monterosso, 756 F.3d 1326, 1336 n.19 (11th Cir. 2014).

### D.   The Manipulative Trading Scheme: Marking the Close

By attempting to manipulate the price of CYBE, Cope violated the scheme

liability provisions of the Exchange Act, Rule 10b-5(a) and (c) and of the

Securities Act, Sections 17(a)(1) and (3).  He also made related material

misrepresentations or omissions to Fund investors in violation of Rule 10b-5(b)

and Section 17(a)(2).

### 1.   The Marking the Close Scheme and Scienter

Market manipulation constitutes a fraudulent scheme in violation of

Section 10(b) and Rules 10b-5(a) and (c).  See Santa Fe Indus., Inc. v. Green, 430

U.S. 462, 476 (1977) (holding that "manipulation" under Section 10(b), "refers

generally to practices, such as wash sales, matched orders, or rigged prices, that

are intended to mislead investors by artificially affecting market activity"). "[I]f

an investor conducts an open-market transaction with the intent of artificially

affecting the price of the security, and not for any legitimate economic reason, it

can constitute market manipulation." SEC v. Masri, 523 F. Supp. 2d 361, 372

(S.D.N.Y. 2007).

Here, Cope marked the close with the intent to artificially inflate the price

of CYBE and, thereby, inflate his fees. Cope placed several buy orders for CYBE

in the last 30 minutes on the last trading day of at least 5 months. Markusen did

so in more than 20 months. The SEC's expert opined that the pattern of trades by

Markusen and Cope is consistent with an attempt to mark the close.

Cope knew that CYBE was the Funds' largest holding and was thinly

traded, so he could impact the share price. Cope told the Funds' administrator

that a "funky" CYBE closing price could "adversely impact monthly results."

Cope personally sent monthly results to investors and also used them to solicit

new investors. Moreover, CYBE's share price had recently been in decline,

hurting the Funds' performance. Cope knew that Archer's performance and,

thus, Archer's fees were based on the Funds' value at the end of the month, so he

knew that higher CYBE prices on those days allowed him to report higher

monthly returns to existing and prospective investors and to collect additional management fees.

Cope and Markusen marked the close in the Funds' largest holding at least 28 times in three and a half years.  They marked the close on the last trading day of the month even as Fund performance plummeted, investors complained, and CYBE's share price dropped.  Cope was an experienced investor who closely monitored the market for CYBE on Archer's behalf.  Finally, when asked about marking the close, Cope took the Fifth Amendment during his deposition, further bolstering a finding of scienter.

### 2. Material Omissions from Marking the Close

A reasonable investor would have wanted to know that Cope and Markusen were manipulating the CYBE closing price in order to artificially inflate the Funds' monthly performance.  Thus, Cope's and Markusen's failure to disclose their scheme was material.

### 3. "In Connection With" and "In the Offer or Sale" of Securities and by Means of Interstate Commerce

Cope marked the close in CYBE in connection with the manipulative CYBE purchases that Cope made.  His conduct was also in the offer or sale of securities because Cope and Markusen used the inflated performance figures created by

33

marking the close to solicit new investors.  The solicitations of new investors

constituted an offer of securities because the Funds' OMs referred to each

investor's LLC interests in the Funds as "securities."

As previously noted, email is a means of interstate commerce, and Cope

emailed and instant messaged D&D to execute trades and emailed investors to

solicit them.

### E.    The Advisers Act

### 1.    Standard for Liability under the Advisers Act

Sections 206(1) and (2) of the Advisers Act provide:

> It shall be unlawful for any investment adviser, by use of the mails
> or any means or instrumentality of interstate commerce, directly or
> indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud any client or
> prospective client; [or]
>
> (2) to engage in any transaction, practice, or course of business
> which operates as a fraud or deceit upon any client or prospective
> client;

15 U.S.C. § 80b–6.  Advisers are fiduciaries who owe their clients "an affirmative

duty of utmost good faith, and full and fair disclosure of all material facts, as

well as an affirmative obligation to employ reasonable care to avoid misleading

[their] clients."  SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194

(1963) (footnotes omitted).  Liability under Section 206(1) requires proof of

scienter, but liability under Section 206(2) does not.  Steadman v. SEC, 603 F.2d

1126, 1134 (5th Cir 1979).

### 2.      Whether Archer and Markusen Were Advisers

The Advisers Act defines an "investment advisor" as

> any person who, for compensation, engages in the business of
> advising others, either directly or through publications or writings,
> as to the value of securities or as to the advisability of investing in,
> purchasing, or selling securities, or who, for compensation and as
> part of a regular business, issues or promulgates analyses or reports
> concerning securities.

15 U.S.C. § 80b–2(a)(11).  The statute also lists a variety of exceptions, none of

which apply here.

Archer was an adviser because it was paid by the Funds to manage their

investment portfolios.  Markusen, Archer's CEO and owner, controlled Archer.

Thus, both Archer and Markusen qualify as advisers.

### 3.      Scheme to Defraud

Markusen used Archer to misappropriate improper research expenses

from the Funds.  He further failed to disclose the conflict of interest created by an

Archer insider, Cope, receiving soft dollars and research fees from the Funds.

**4.    Use of the Mails or Any Means or Instrumentality of Interstate Commerce**

Markusen used email to communicate with investors and with D&D.  As noted previously, email is a means or instrumentality of interstate commerce.

**F.    Aiding and Abetting Liability**

Cope incurred secondary liability because he "knowingly or recklessly provide[d] substantial assistance to another person" in violation of the Exchange Act and "knowingly or recklessly [] aided, abetted, counseled, commanded, induced, or procured a violation" of the Advisers Act.  15 U.S.C. § 78t(e); 15 U.S.C. § 80b-9(f); K&S P'ship v. Cont'l Bank, N.A., 952 F.2d 971, 977 (8th Cir. 1991) (pre-Dodd-Frank) (listing elements of secondary liability as: a primary violation, knowledge of the primary violation, and "substantial assistance").

Cope knew that Archer and Markusen misappropriated Fund assets to pay for phony research services and marked the close in CYBE, in violation of Section 10(b) and Rule 10b-5 under the Exchange Act.  Cope also knew that Archer and Markusen were defrauding the Funds of research expenses and manipulating the price of CYBE to pump up the value of the Funds, in violation of Sections 206(1) and 206(2) of the Advisers Act.  Cope knowingly provided substantial assistance to those violations by preparing misleading research invoices; by opening the

36

Funds' soft-dollar CYBE account and then day trading on that account; and by

marking the close in CYBE multiple times.

### G. Remedies

#### 1. Permanent Injunction

Under Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b); Section

21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(2); and Section 209(d) of the

Advisers Act, 15 U.S.C. § 80b-9(d); the SEC may seek a permanent injunction to

prevent a defendant from violating federal securities laws.  The Court should

grant the permanent injunction if the SEC proves that the defendant "violated

the law <u>and</u> that there [was] a <u>reasonable likelihood</u> of further violation in the

future."  <u>SEC v. Comserv Corp.</u>, 908 F.2d 1407, 1412 (8th Cir. 1990) (citations

omitted).  When predicting the likelihood of further violations, the Court

considers

> the totality of the circumstances, including: (1) the degree of scienter
> involved; (2) the isolated or recurrent nature of the infraction; (3) the
> defendant's recognition of the wrongful nature of his conduct; (4)
> the likelihood, because of defendant's professional occupation, that
> future violations might occur; (5) and the sincerity of his assurances
> against future violations.

<u>SEC v. M & A W., Inc.</u>, 538 F.3d 1043, 1055 (9th Cir. 2008) (citation omitted).  The

Court also considers evidence of past violations, <u>SEC v. Gruenberg</u>, 989 F.2d 977,

978 (8th Cir. 1993), and the egregiousness of the past violation, SEC v. Sargent, 329 F.3d 34, 39 (1st Cir. 2003).

The Court concludes that a permanent injunction against Cope is appropriate because he is an experienced participant in the securities industry who exploited the trust of his investors to misappropriate hundreds of thousands of dollars through an intentional, multi-year fraud. He also engaged in market manipulation, which undermines the investing public's faith in the public securities markets. Cope has not admitted wrongdoing or given assurances that he will not violate securities laws in the future. Under these circumstances, a permanent injunction is justified.

### 2. Disgorgement

#### a) Disgorgement Amount

[A] district court has broad equity powers to order the disgorgement of ill-gotten gains obtained through the violation of the securities laws. Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable. [T]he amount of disgorgement should include all gains flowing from the illegal activities. Disgorgement need be only a reasonable approximation of profits causally connected to the violation.

The SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment. Once the SEC establishes a reasonable approximation

of defendants' actual profits, . . . the burden shifts to the defendants to demonstrate that the disgorgement figure was not a reasonable approximation.  . . .

SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1096 (9th Cir. 2010) (citations omitted).  "[D]isgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud[.]"  SEC v. Brown, 658 F.3d 858, 860-61 (8th Cir. 2011) (quoting SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1, 17 (D.D.C. 1998)).  "[T]he overwhelming weight of authority hold[s] that securities law violators may not offset their disgorgement liability with business expenses."  Id. at 861 (citation omitted).  "[T]he Court has the equitable authority to order disgorgement in an amount equal to Defendants' ill-gotten gains without requiring that the amount disgorged be tied to specific funds or assets within Defendants' possession and control."  Quan, 2014 WL 4670923, at *13.

Cope made at least $549,284.97 as a result of his fraud: $449,784.97 in soft-dollar payments based on Cope's "research" invoices and $99,500 in research fees Cope received from Archer.  (Aguilar Decl. ¶¶ 12-15.)

The SEC has met its burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment.  Because Cope has

not responded, there is no evidence to rebut the SEC's proof that its figure is

reasonable and accurate.

### b)  Prejudgment Interest on the Disgorgement Amount

The Court's decisions on whether to grant an award of prejudgment

interest and on the rate used are within the Court's discretion.  <u>SEC v. First Jersey</u>

<u>Sec., Inc.</u>, 101 F.3d 1450, 1476 (2d Cir. 1996).

> In deciding whether an award of prejudgment interest is warranted,
> a court should consider (i) the need to fully compensate the
> wronged party for actual damages suffered, (ii) considerations of
> fairness and the relative equities of the award, (iii) the remedial
> purpose of the statute involved, and/or (iv) such other general
> principles as are deemed relevant by the court.  In an enforcement
> action brought by a regulatory agency, the remedial purpose of the
> statute takes on special importance.

<u>Id.</u> (citations omitted).

Prejudgment interest at the rate established by the Internal Revenue

Service for tax underpayment is awarded on the disgorgement in order to

prevent Defendant from being unjustly enriched through the time-value of the

money they fraudulently obtained.  <u>See, e.g.</u>, <u>Quan</u>, 2014 WL 4670923, at *14.

"That rate reflects what it would have cost to borrow the money from the

government and therefore reasonably approximates one of the benefits the

defendant derived from its fraud."  <u>First Jersey Sec., Inc.</u>, 101 F.3d at 1476.

Thus, the Court awards prejudgment interest at the rate established by the

Internal Revenue Service for tax underpayment, resulting in prejudgment

interest of $81,037.26, for a total disgorgement obligation of $630,322.23.  (Aguilar

Decl. ¶¶ 17-18; Aguilar Decl., Ex. 3.)

### 3.    Civil Penalties

The SEC further requests that the Court impose civil monetary penalties

against Cope under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d); Section

21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and Section 209(e) of the

Advisers Act, 15 U.S.C. § 80b-9(e).  If a defendant's violation involves fraud,

deceit, or manipulation that directly or indirectly results in or creates the risk of

substantial losses to others, the three statutes permit a third-tier penalty in an

amount up to the greater of $150,000 per violation or the defendant's gross

pecuniary gain as a result of the violation.  See 15 U.S.C. §§ 77t(d)(2)(C),

78u(d)(3)(B)(iii), 80b-9(e)(2)(C); 17 C.F.R. § 201.1004 (inflationary adjustment

increasing statutory penalties to $150,000).  Congress enacted these civil penalty

provisions "to achieve the dual goals of punishment of the individual violator

and deterrence of future violations." SEC v. Moran, 944 F. Supp. 286, 296

(S.D.N.Y. 1996).

The amount of the penalty is within the Court's discretion.  See, e.g., 15 U.S.C. § 78u(d)(3)(B) (providing that the court shall determine the amount of penalties "in light of the facts and circumstances").  "Factors courts have considered include the egregiousness of the violation, the isolated or repeated nature of the violations, the degree of scienter involved, and the deterrent effect given the defendant's financial worth," SEC v. Converge Global, Inc., No. 04-80841CV, 2006 WL 907567, at *6 (S.D. Fla. Mar. 10, 2006), as well as "whether the defendant has admitted wrongdoing, the losses or risks of losses caused by the conduct, and any cooperation the defendant provided to enforcement authorities," SEC v. Church Extension of the Church of God, Inc., 429 F. Supp. 2d 1045, 1050 (S.D. Ind. 2005).  The Court may also "consider whether the defendant faces other criminal or civil sanctions and his or her financial condition." SEC v. Brown, 643 F. Supp. 2d 1088, 1092 (D. Minn. 2009), aff'd 658 F.3d 858 (8th Cir. 2011) (citations omitted).

Certain factors weigh in favor of a substantial civil penalty.  Cope had experience in the financial industry, and he occupied a position of trust.  He engaged in repeated and deceptive acts.  He participated in multiple illegal schemes that lasted for several years and caused substantial losses to investors.

He has not admitted wrongdoing or shown remorse.  On the other hand, the SEC does not point to any evidence regarding Cope's ability to pay a civil penalty. Balancing the factors before the Court, the Court concludes that a penalty of $100,000 is appropriate.

## IV.    Judgment

On November 10, 2015, the Court granted the SEC's motion for default judgment against Markusen and Archer, but withheld entry of default judgment until the SEC's claims against Cope were resolved.  Accordingly, now the Court will enter final judgment against all three Defendants.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

1.    Plaintiff's Motion for Summary Judgment against Defendant Jay C. Cope [Docket No 40] is **GRANTED**.

2.    Defendants Steven R. Markusen, Archer Advisors LLC, and Jay C. Cope are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

a.    to employ any device, scheme, or artifice to defraud;

b.  to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c.  to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

3.  Defendant Jay C. Cope is permanently restrained and enjoined from aiding and abetting any violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, by knowingly or recklessly providing substantial assistance to any person who, by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

a.  to employ any device, scheme, or artifice to defraud;

b.  to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c.  to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

4.  Defendants Steven R. Markusen, Archer Advisors LLC, and Jay C. Cope are permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

a.  to employ any device, scheme, or artifice to defraud;

b.    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

5.    Defendants Steven R. Markusen and Archer Advisors LLC are permanently restrained and enjoined from violating Section 206(1) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-6(1), by, as an investment adviser, using the mails, or any means or instrumentality of interstate commerce, directly or indirectly, to employ any device, scheme, or artifice to defraud any client or prospective client.

6.    Defendants Steven R. Markusen and Archer Advisors LLC are permanently restrained and enjoined from violating Section 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-6(2), by, as an investment adviser, using the mails, or any means or instrumentality of interstate commerce, directly or indirectly, to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

7.    Defendant Jay C. Cope is permanently restrained and enjoined from aiding and abetting any violation of Sections 206(1) and 206(2) of the Advisers Act of 1940, 15 U.S.C. §§ 80b-6(1) and 80b-6(2), by knowingly or recklessly providing substantial assistance to any investment adviser which, by use of the mails or the means and instrumentalities of interstate commerce, directly or indirectly, employs any device, scheme, or artifice to defraud, or engages in transactions, practices, or courses of business which operate as a fraud or deceit, upon any clients or prospective clients.

8.    Defendant Archer Advisors LLC is permanently restrained and enjoined from violating Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3 thereunder, 17 C.F.R.§ 240.16a-3 by, as a direct or indirect beneficial owner of more than 10 percent of any class of any equity security, failing to file the statements required by the SEC.

9.    As provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraphs, Paragraphs 2 through 8, also bind the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendants' officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendants or with anyone described in (a).

8.    Defendant Steven R. Markusen is liable, jointly and severally with Defendant Archer Advisors LLC, for disgorgement of $630,830.31, representing profits gained and losses avoided as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon calculated at the rate established by the Internal Revenue Service for tax underpayment, and Defendant Steven R. Markusen is liable for a civil penalty in the amount of $100,000.00 pursuant to 15 U.S.C. §§ 77t(d), 78u(d)(3), and 80b-9(d).  Defendant Steven R. Markusen shall satisfy this obligation by paying $730,830.31, plus the appropriate prejudgment interest, to the Securities and Exchange Commission within 14 days after entry of this Judgment.

       a.    Defendant may transmit payment electronically to the SEC, which will provide detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Defendant

may also pay by certified check, bank cashier's check, or
United States postal money order payable to the
Securities and Exchange Commission, which shall be
delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the
case title, civil action number, and name of this Court;
Steven R. Markusen as a defendant in this action; and
specifying that payment is made pursuant to this
Judgment.

b.    Defendant shall simultaneously transmit photocopies of
evidence of payment and case identifying information
to the SEC's counsel in this action.  By making this
payment, Defendant relinquishes all legal and equitable
right, title, and interest in such funds and no part of the
funds shall be returned to Defendant.  The SEC shall
send the funds paid pursuant to this Judgment to the
United States Treasury.

c.    Defendant shall pay post judgment interest on any
delinquent amounts pursuant to 28 U.S.C. § 1961.

9.    Defendant Archer Advisors LLC is liable, jointly and severally
with Defendant Steven R. Markusen, for disgorgement of
$630,830.31, representing profits gained and losses avoided as
a result of the conduct alleged in the Complaint, together with
prejudgment interest thereon calculated at the rate established
by the Internal Revenue Service for tax underpayment, and
that Defendant Archer Advisors LLC is liable for a civil
penalty in the amount of $100,000.00 pursuant to 15 U.S.C. §§

77t(d), 78u(d)(3), and 80b-9(d).  Defendant Archer Advisors
LLC shall satisfy this obligation by paying $730,830.31, plus
the appropriate prejudgment interest, to the Securities and
Exchange Commission within 14 days after entry of this
Judgment.

a.     Defendant may transmit payment electronically to the
       SEC, which will provide detailed ACH transfer/Fedwire
       instructions upon request.  Payment may also be made
       directly from a bank account via Pay.gov through the
       SEC website at
       http://www.sec.gov/about/offices/ofm.htm.  Defendant
       may also pay by certified check, bank cashier's check, or
       United States postal money order payable to the
       Securities and Exchange Commission, which shall be
       delivered or mailed to

       Enterprise Services Center
       Accounts Receivable Branch
       6500 South MacArthur Boulevard
       Oklahoma City, OK 73169

       and shall be accompanied by a letter identifying the
       case title, civil action number, and name of this Court;
       Archer Advisors LLC as a defendant in this action; and
       specifying that payment is made pursuant to this
       Judgment.

b.     Defendant shall simultaneously transmit photocopies of
       evidence of payment and case identifying information
       to the SEC's counsel in this action.  By making this
       payment, Defendant relinquishes all legal and equitable
       right, title, and interest in such funds and no part of the
       funds shall be returned to Defendant.  The SEC shall
       send the funds paid pursuant to this Judgment to the
       United States Treasury.

48

c.     Defendant shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

10.    Defendant Jay C. Cope is liable for disgorgement of $549,284.97, representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $81,037.26, and a civil penalty in the amount of $100,000.00 pursuant to 15 U.S.C. §§ 77t(d) and 78u(d)(3).  Defendant Cope shall satisfy this obligation by paying $730,322.23 to the Securities and Exchange Commission within 14 days after entry of this Judgment.

a.     Defendant may transmit payment electronically to the SEC, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Jay C. Cope as defendant in this action; and specifying that payment is made pursuant to this Judgment.

    b.      Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the SEC's counsel in this action.  By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.  The SEC shall send the funds paid pursuant to this Judgment to the United States Treasury.

    c.      Defendant shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

11.    The SEC may enforce the Court's Judgment for disgorgement and prejudgment interest by moving for civil contempt (and/or through other collection procedures authorized by law) at any time after 14 days following entry of this Judgment.

12.    The SEC shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.  The SEC may propose a plan to distribute the Fund subject to the Court's approval.  If the SEC determines that the Fund will not be distributed, the SEC shall send the funds paid pursuant to this Judgment to the United States Treasury.

13.    After Judgment is entered, this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   April 25, 2016        s/ Michael J. Davis_____

                                        Michael J. Davis
                                        United States District Court